Argued and submitted November 25, 1997, affirmed October 14, 1998

## OREGON LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION,
*Appellant,*

*v.*

## INTER-REGIONAL FINANCIAL GROUP, INC.,
nka Interra Financial Incorporated,
and Dain Bosworth Incorporated,
*Respondents.*

(9504-02539; CA A95352)

967 P2d 880

William J. Hansen, Denver, Colorado, argued the cause for appellant. With him on the briefs were Gerald P.

McDermott and McDermott & Hansen, Denver, Colorado, Daniel M. Reilly and McKenna & Cuneo, L.L.P., Denver, Colorado, Larry S. Pozner and Larry Pozner, P.C., Denver, Colorado, and Patrick N. Rothwell and Hallmark, Keating & Abbott, P.C., Portland, Oregon.

James K. Langdon II, Minneapolis, Minnesota, argued the cause for respondents. With him on the brief were Roger J. Magnuson, James B. Lynch, Clifford S. Anderson, and Dorsey & Whitney LLP, Minneapolis, Minnesota, and Michael H. Simon, Andrew J. Bowman, and Perkins Coie, Portland, Oregon.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

This action arises out of the sale of single premium deferred annuities to 12 Oregon citizens. The company that sold those annuities, Midwest Life Insurance Company (Midwest), eventually collapsed, causing the Oregon annuity holders to lose their investments. Plaintiff, Oregon Life and Health Insurance Guaranty Association, as a statutory guarantor, paid the losses sustained by the Oregon annuity holders and, in so doing, became subrogated to their claims.[1] It then filed subrogated claims for fraud, negligence, breach of fiduciary duty and a direct action claim for intentional interference with a business relationship.[2] Plaintiff appeals from a judgment entered for defendants after the trial court granted partial summary judgment for defendants.[3] We affirm.

On review of summary judgment, we state the evidence, and all reasonable inferences, in the light most favorable to the nonmoving party—here, plaintiff. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). In 1980, Inter-Regional Financial Group, Inc. (Inter-Regional), purchased Midwest as a shell corporation, using it to develop and sell single premium deferred annuities. At the time of its purchase, Midwest had no established financial history, no preexisting investment portfolio, no preexisting annuity contracts and no insurance industry rating. Inter-Regional marketed the annuities through another of its wholly owned subsidiaries, Dain Bosworth (Dain). Dain's

---

[1] Plaintiff is a creature of statute, and comprises the life and health insurance companies doing business in Oregon and designed to protect persons holding life insurance policies and annuity contracts against loss due to insurance company insolvencies. *See* ORS 734.750 through ORS 734.890. In the case of such an insolvency, plaintiff pays the cost of the lost investments and, in so doing, is assigned the right to pursue any claims the annuity holders might have against the insolvent insurer. ORS 734.810(7)(a).

[2] Plaintiff also filed an ORICO claim under ORS 166.720, which was later dismissed pursuant to defendants' motion. Plaintiff has not appealed that ruling.

[3] After the court's ruling on summary judgment, several claims remained. However, pursuant to a Stipulation and Order for Entry of Final Judgment, in which the parties agreed to a voluntary dismissal of the remaining claims pending appeal, the court's ruling on summary judgment was later reduced to a final judgment.

brokers marketed the annuities as safe, secure and guaranteed investments, targeting its older, most conservative and risk-averse clients.

In the mid 1980s, Inter-Regional suffered financial losses and decided to sell Midwest to raise capital. In 1985, Inter-Regional informed Dain's sales force that it was seeking a buyer who "[wa]s going to take good care of those existing [Midwest] annuity holders" and that "[the annuity holders] need * * * some assurance now * * * from you * * * [that] 'hey, things are going to be okay.' * * *" In 1986, Inter-Regional identified a buyer, Finevest.

The president of Midwest, Quirk, objected to that buyer, noting that if Midwest was sold to Finevest, he had "great concern for the ultimate welfare of the existing policy holders." Quirk based his opinion on a large body of public information concerning the poor performance history of Finevest in the annuities industry. Notwithstanding Quirk's objection, Inter-Regional sold Midwest to Finevest, including in the sales agreement the following provision:

> "[Dain] * * * will not promote or recommend or in any way encourage, nor permit any of your sales force to promote, recommend or in any way encourage, the termination, surrender or cancellation of any Midwest [single premium deferred annuity] sold pursuant to this Selling Agreement; [Dain] agree[s] to take all such reasonable actions to conserve such contracts."

Following Midwest's sale in 1986, Dain hired Smith, who was Midwest's Vice President of Marketing, to monitor Midwest's ongoing financial stability. Dain's sales force (including those brokers who had sold the annuities to Oregon citizens) relied on Smith for information concerning Midwest. Beginning with the 1986 sale, Midwest's financial stability eroded steadily until its ultimate collapse in 1991.[4] During that time, Smith was aware of Midwest's steady

---

[4] Following the initial sale, Midwest was sold twice more, experienced an industry rating downgrade from B+ to B-, received a negative status report from the Nebraska Department of Insurance, had its certificate to conduct business suspended by the Kansas Department of Insurance, was placed into conservatorship by the Louisiana Insurance Commission and ultimately was declared insolvent by a Louisiana court.

decline, prompting him in 1988 to suggest to his boss, Podratz, that "the brokers should contact their clients[.]" Instead, Podratz recommended the opposite. That recommendation reflected an ongoing effort by Inter-Regional and Dain's upper management to keep Dain's sales force unaware of Midwest's eroding financial condition, facilitated by reassurances from Smith to the sales force that nothing was wrong and by reminders that guaranty provisions protected the annuity holders against loss. That effort screened both Dain's brokers and the annuity holders from Midwest's increasingly bleak financial circumstance.

On August 26, 1991, Midwest was declared insolvent. Two days later, Dain, without going through its brokers, sent the annuity holders the following letter,[5] which provided, in part:

> "We have just learned that on August 26, 1991, [Midwest] was declared insolvent and ordered to liquidate by a court in Louisiana. This court order * * * marks the point at which certain state guaranty associations may begin activating their guaranty funds to assume the liabilities of [Midwest] annuity holders who are residents of their state.
>
> "* * * * *
>
> "If the value of your [Midwest] annuity is within the maximum liability limits of your state and you are fully compensated by your state's guaranty fund, then you will be deemed to have assigned all of your claims against [Midwest] to your state's guaranty association, and you need do nothing further. * * *"

Because the annuity holders expected their brokers to warn them of any problems with their investments and because they had not been warned about Midwest's problems, the "insolvency" letter concerned the annuity holders who received it. However, after being reassured by their brokers that the annuities were guaranteed, and after that guaranty came to pass,[6] the annuity holders did not investigate

---

[5] One annuity holder, Coverdale, did not receive the "insolvency" letter.

[6] That guaranty was achieved by transferring the annuity contracts to a new company, rather than sending payments directly to the annuity holders.

the situation further. On August 17, 1995, plaintiff filed this action.[7]

Defendants moved for summary judgment on all of plaintiff's claims, which the trial court granted in part. The trial court ruled that the fraud, negligence and breach of fiduciary duty claims of eight of the nine annuity holders (except for Coverdale, who did not receive the August 28 letter) were barred by the statute of limitations. The trial court also ruled that the facts did not support the negligence claims of the three deceased annuity holders or plaintiff's direct action tort claim.

■    Plaintiff assigns error to each of the trial court's rulings on defendants' summary judgment motion. Plaintiff, as a subrogee, stands in the shoes of the annuity holders and can assert rights no greater than those of the annuity holders. *State ex rel Healy v. Smither*, 290 Or 827, 832, 626 P2d 356 (1981). In other words, in all but the direct action claims, we analyze the subrogated claims from the perspective of the annuity holders, considering the circumstances as they were known to the annuity holders.

In determining whether summary judgment was proper, it is not our job to decide issues of fact but solely to determine if there are material issues of fact to decide. ORCP 47 C; *Jones*, 325 Or at 420. In so doing, we review the evidence and all reasonable inferences in the light most favorable to plaintiff to determine if only one reasonable conclusion may be drawn from it. *Id.* If not, then summary judgment was improper. We begin with the statute of limitations.

Plaintiff has alleged claims on three different legal theories—negligence, fraud and breach of fiduciary duty. Those claims are governed by the two-year statute of limitations period contained in ORS 12.110(1), which provides, in part:

---

[7] We note that a nationwide class action fraud claim filed in Colorado against defendants resulted in a stipulation that tolled the running of the statute of limitations for all potential class members, including plaintiff, effective February 14, 1994. Thus, February 14, 1994, marks the critical date for purposes of measuring whether plaintiff's action is time barred.

"An action for * * * an injury to the person or rights of another, not arising on contract, * * * shall be commenced within two years; provided, that in an action * * * based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

■ That statute creates two standards for determining when the limitations period commences: one for fraud and another for negligence. Each standard incorporates the so-called "discovery rule." For fraud claims, the second sentence of ORS 12.110(1) itself integrates that doctrine into the limitations rule. For negligence claims, the Oregon Supreme Court in *Berry v. Branner*, 245 Or 307, 312, 421 P2d 996 (1966), engrafted that doctrine onto the first sentence of the statute. *Gaston v. Parsons*, 318 Or 247, 254-55, 864 P2d 1319 (1994). In *Condon v. Bank of California*, 92 Or App 691, 694-95, 759 P2d 1137 (1988), we held that the discovery rule is applicable to claims of breach of fiduciary duty as well.

In making a determination as to when plaintiff "discovered" its negligence and breach of fiduciary duty claims, we must determine whether, under the circumstances, plaintiff knew or, in the exercise of reasonable care, should have known "facts which would make a reasonable person aware of a substantial possibility that each of the three elements [of legally cognizable harm] (harm, causation, and tortious conduct) exists." *Gaston*, 318 Or at 256. That test is an objective one and here, as in most cases, concerns what plaintiff should have known under the circumstances. *Id.*

As to the fraud claims, the analysis "is essentially similar, except that the actual or inquiry knowledge that a plaintiff must have in order to start the running of the statute has sometimes been described as including the fact of the fraud itself." *Widing v. Schwabe, Williamson & Wyatt*, 154 Or App 276, 283, 961 P2d 889 (1998). However, in *Widing*, because the plaintiff's fraud and negligence claims were based on the same underlying false representation, and because the plaintiff had knowledge of that representation's falsity, we concluded that that difference was not material. *Id.* at 283-84. This case is analogous in that plaintiff's negligence and fraud claims similarly derive from the same alleged misrepresentation and, as described below, plaintiff

similarly knew of that representation's falsity. Thus, we conclude that here the above-noted difference in the discovery rule analysis is likewise not material.

In either case, the presence of a fiduciary relationship may be relevant to the determination of what a plaintiff should have known under the circumstances. *See Penuel v. Titan / Value Equities Group, Inc.*, 127 Or App 195, 201, 827 P2d 28, *rev den* 319 Or 150 (1994) (despite reports showing that investments previously represented as secure were suffering financial difficulties, a broker's constant false reassurances that those investments were sound could be considered by jury in deciding what inquiry the plaintiff reasonably should have made); *see also Gaston*, 318 Or at 257 (in negligence case, holding that fiduciary relationship "may also have a bearing on whether a reasonable person would be aware of" the claim).

Neither party disputes that defendants marketed the annuities as "safe," that by September 1991 eight annuity holders had received the "insolvency" letter and that none of those eight persons had been forewarned of Midwest's demise. Based on those facts, the trial court concluded that

> "if [those eight] policyholders were harmed by [Midwest's] insolvency, * * * they must have known it by then. And if defendants caused that harm, by falsely representing that the annuities were safe investments with a secure company, the policyholders must have known that too. * * * No policyholder, however novice or naive, could reasonably believe that nothing was amiss after receiving notice that [Midwest] had been seized by regulators and was no longer solvent."

By so concluding, the trial court determined that the statute of limitations on plaintiff's claims for fraud, negligence and breach of fiduciary duty with respect to those eight persons had commenced in September 1991 and had expired two years later, before the tolling events occurred.

Plaintiff argues that the trial court erred as to all three claims because "[t]hat loss alone does not excite attention to some misconduct by * * * Dain's distant management in Minneapolis * * * [and] does not inferentially implicate

misconduct by the even more remote parent, [Inter-Regional]." Defendants counter, contending that the undisputed facts—knowledge of loss, identity of seller and awareness of prior false representations—gave the annuity holders sufficient information about *each* claim to meet the necessary level of claim awareness to trigger the limitations period.

We turn first to plaintiff's negligence and fraud claims. Plaintiff alleged that defendants negligently failed to advise the annuity holders of Midwest's status as a new company with no financial history before their purchase of the annuities and that, after the sale, defendants negligently failed to communicate information concerning Midwest's decline. Thus, the basis of the negligence claim is that defendants negligently failed to pass along material information to the annuity holders that would have protected them from losing their investment due to Midwest's collapse. In plaintiff's fraud claims, it similarly alleged that defendants misrepresented past and present material facts and failed to disclose certain material facts about Midwest and the annuities "with the intent of creating a false impression of the actual facts in the minds of the [annuity holders]."

As to each claim, plaintiff's argument that the statute of limitations had not commenced relies on a three-party relationship between Inter-Regional's and Dain's upper management, Dain's sales force, and the annuity holders. Plaintiff asserts that Inter-Regional's and Dain's upper management used the fiduciary nature of the broker-client relationship and the existence of a guaranty fund to mask their wrongdoing. Plaintiff further contends that by withholding material information from its sales force, who then unintentionally kept that information from the annuity holders, the upper management created two discrete relationships: one between upper management and the sales force and one between the sales force and its clients. The important result, according to plaintiff, was that within that tripartite relationship, the broker-client relationship remained an honest one, as to both broker and client.[8]

---

[8] For example, at the hearing on the motion for summary judgment, plaintiff's counsel stated:

Consequently, plaintiff argues that the "insolvency" letter would not necessarily "excite" the annuity holders' attention to the corporate-level negligence or fraud because, even though an investment that was believed to be secure proved otherwise, the brokers had been truthful about its guaranteed nature. Plaintiff further contends that, even if the letter did "excite" attention, precisely when and what a reasonable inquiry would have uncovered is an open question because, on receipt of that letter, the brokers, to whom the annuity holders would turn first with questions, had "no information to pass along." We disagree with plaintiff.

■■■ As noted, though the presence of a fiduciary relationship may affect a plaintiff's duty of reasonable inquiry and thus toll the statute of limitations, the presence of such a relationship here did not have a tolling effect. In this case, the aspects of the fiduciary relationship on which plaintiff relies—truthful explanations in the insolvency letter that guaranty associations might cover all or at least some of the losses and the fact that Dain's salespeople themselves were screened from the corporate-level wrongful conduct—were neither misleading nor falsely reassuring as to the underlying alleged misrepresentation. Neither the "insolvency" letter nor the deception practiced on Dain's brokers allayed the alarming reality that what had been previously represented to be a secure investment was worthless. To the contrary, the alleged scheme of deception would actually increase the annuity holders' awareness of having suffered a legal wrong. In other words, receiving the "insolvency" letter, with its news about the complete loss of an investment purchased because it was secure, would be made all the more shocking by the annuity holders' previous false impression that nothing was, or ever had been, wrong with Midwest.

When the annuity holders received the "insolvency" letter, they possessed knowledge that key material facts were not as they had been represented, which is sufficient under the discovery rule to trigger the running of the statute of limitations as to plaintiff's negligence and fraud claims. *See*

"There is no reason for [the annuity holders] to think, 'I have a claim against my broker. My broker told me it was guaranteed, the company's gone under, and my broker is now telling me again it's still guaranteed,' and it was."

*Saenz v. Pittenger*, 78 Or App 207, 212, 715 P2d 1126 (1986) ("Although [the plaintiff] did not know at that time that she could prove that the statements were made with knowledge of their falsity, she knew that she had been damaged by a false statement and who had made it."). As a matter of law, no other conclusion reasonably follows. That awareness obligated the annuity holders to investigate and file their claims within two years. Moreover, given the public and notorious nature of Midwest's collapse, a reasonable inquiry with the states in which Midwest had conducted business would have led to the discovery of much of Midwest's tarnished past, which, in turn, would reasonably have led to discovery of plaintiff's claims. Accordingly, plaintiff's negligence and fraud claims accrued in September 1991 and were properly dismissed as time barred in 1995.

■ The above statute-of-limitations analysis applies to plaintiff's breach of fiduciary duty claim as well. Here, plaintiff alleged conduct that could be either negligent or fraudulent—conduct that follows, essentially, plaintiff's fraud and negligence claims. Although the legally protected interest of fiduciary duty is different, the alleged wrongful conduct comprising the breach results from the conduct alleged in the negligence and fraud claims, and, accordingly, the breach of fiduciary duty claim also was properly barred by the limitations period.

In its second assignment of error, plaintiff argues that the trial court erred in granting partial summary judgment as to the negligence claims of three deceased annuity holders by "wrongly equat[ing] a fiduciary relationship with a 'special relationship[.]' " Plaintiff concedes that it cannot establish a fiduciary relationship between the deceased annuity holders and their Dain brokers because the essential witnesses are dead. Plaintiff nonetheless contends that such proof is not necessary to establish a "special relationship."

To maintain an action on a theory of negligence, where recovery of purely economic loss[9]—*i.e.*, financial loss

---

[9] As used in this opinion, the term "economic loss" describes financial losses, such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property. *See Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159 n 6, 843 P2d 890 (1992) (accord).

without injury to person or property—is sought, "the parties must be in a 'special relationship,' in which the [defendant] had some obligation to pursue the [economic] interests of the [plaintiff]." *Conway v. Pacific University*, 324 Or 231, 237, 924 P2d 818 (1996); *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 161, 843 P2d 890 (1992). Unless otherwise established by law, that duty must be decided on a "case-by-case basis," *id.* at 159-61, an analysis that naturally requires the consideration of facts unique to the case at hand. Whether such a relationship existed is a question of law. *Id.* at 160; *Conway,* 324 Or at 237.

Plaintiff advances three arguments in an attempt to establish a "special relationship" in the absence of proof as to the specific circumstances of the relationship between the deceased annuity holders and their brokers. The arguments relate to the general characteristics of an insurance broker-client relationship. Plaintiff contends that its claim "is not dependent upon direct testimony of the policyholders but can be established through the surrounding facts and * * * reasonable inferences therefrom." We disagree.

As noted, under a negligence theory in which the recovery of economic loss is sought, as is the situation here, evidence of the particulars of the broker-client relationship is required. Such a relationship cannot be inferred because

> "one ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property. It does not suffice that the harm is a foreseeable consequence of negligent conduct that may make one liable to someone else, for instance to a client. Some source of a duty outside the common law of negligence is required." *Onita,* 315 Or at 159 (quoting with approval *Hale v. Groce*, 304 Or 281, 744 P2d 1289 (1987)).

Here, the record contains no evidence regarding the amount of discretion the deceased clients entrusted to their brokers and, thus, provides no basis on which to decide whether a "special relationship" existed. Therefore, we agree with the trial court's ruling as to the negligence claims of the three deceased annuity holders.

In its third assignment of error, plaintiff argues that the trial court erred in granting defendants' summary judgment motion as to its action for intentional interference with business relations because the court incorrectly found that the relationship between plaintiff and its members was not a valid business relationship or expectancy within the meaning of the tort.[10] Plaintiff concedes that the relationship between it and its members did not arise out of contractual obligations. Notwithstanding, plaintiff argues that the relationship is the kind recognized by the tort because it "has all the elements of any other private association * * * which guarantees contractual obligations." We disagree.

Here, plaintiff and its members are a single entity. To proceed on its direct action claim, plaintiff must establish first that there was a contractual or business relationship between plaintiff and a third party in which defendant interfered. *See McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 941 (1995) (listing that factor as one of five elements); *see also Uptown Heights Associates Ltd. Partnership v. Seafirst Corp.*, 320 Or 638, 651, 891 P2d 639 (1995) (same). In other words, the tort does not protect the business expectations of a single entity; it protects the contractual or business relationship between a plaintiff and a third party. *See McGanty*, 321 Or at 536 (stating that the "tort serves as a means of protecting contracting parties against interference in their contracts from *outside* parties" (emphasis in original)); *see also Lewis v. Oregon Beauty Supply Co.*, 302 Or 616, 622, 733 P2d 430 (1987) (holding that the "salient inquiry in any interference claim is whether defendant's tortious conduct damaged plaintiff's economic or contractual relationship[,]" which could occur by "[d]efendant's interference * * * caus[ing] a *third person* to discontinue the relationship with plaintiff" (emphasis added)). Because plaintiff has not established the first element of the tort, the trial court correctly granted defendants' summary judgment motion as to plaintiff's claim of intentional interference with business relations.

Affirmed.

---

[10] Because this argument is dispositive, we do not address plaintiff's second contention on this assigned error.