Argued and submitted July 27, 1998, reversed and remanded May 19, 1999

## Rob WALKER,
*Appellant,*

*v.*

## Jay WOODWORTH,
individually,
and dba Real Estate Search & Acquisition,
*Respondent.*

## (960403287; CA A98104)

982 P2d 1282

David A. Corden argued the cause for appellant. With him on the briefs were Wendy Hale and Corden Hale & Hale, LLP.

Brad Littlefield argued the cause for respondent. With him on the brief was Williams, Fredrickson, Stark & Littlefield, P.C.

Before Warren, Presiding Judge,* and Edmonds and Armstrong, Judges.

WARREN, S. J.

---

* Warren, S. J., retired February 28, 1999.

## WARREN, S. J.

Plaintiff brought an action against defendant for breach of contract and breach of fiduciary duty arising out of a buyer-broker agreement entered into between plaintiff and defendant. Defendant filed a counterclaim for breach of contract. Plaintiff appeals, assigning error to the entry of summary judgment against his claims for breach of contract and breach of fiduciary duty. We reverse.

On review of summary judgment, we view the evidence and all reasonable inferences in the light most favorable to the nonmoving party, who in this case is plaintiff. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). We will not decide issues of fact, but determine whether there are material issues of fact to be decided. ORCP 47 C; *Oregon Life and Health v. Inter-Regional Financial*, 156 Or App 485, 491, 967 P2d 880 (1998).

On October 21, 1993, plaintiff buyer entered into a written buyer-broker agreement with defendant broker, whereby defendant agreed to act as plaintiff's exclusive representative for the negotiations for and purchase of the Rose View Apartments located at 9345 NE Prescott, Portland, Oregon (Prescott Property).[1] The agreement gave defendant the right to obtain other buyers for that property at any time. The agreement was to terminate at midnight on April 1, 1994.

On October 23, 1993, defendant negotiated an earnest money agreement for plaintiff in which plaintiff agreed to purchase the Prescott Property from McIntosh for $485,000. The agreement set the closing date for December 1, 1993, and contained a "time is of the essence" clause. On December 2, 1993, plaintiff and McIntosh signed an addendum to the earnest money agreement. The addendum

---

[1] The Prescott Property has been sold on contract several times since the last transfer of the fee title. The property was owned in fee by Siham Khoury, who, in 1978, sold the property on contract to Sandra Usher and Alvis Feves. In 1979, Usher and Feves sold the property on contract to William Friesen, who, in 1981, sold the property on contract to a group of investors known as the Brenneke Group. The Brenneke Group sold the property on contract in 1985 to Ronald and Betty McIntosh (McIntosh). At all relevant times, all of these persons had an interest in the Prescott Property.

decreased the amount of cash due at closing and required that all of the underlying contract holders (Khoury, Usher and Eves, Friesen, and the Brenneke Group) consent to the sale. It also waived the "time is of the essence" clause and provided for closing as soon as all of the underlying contract holders had consented and the attorneys had prepared the contract.

During the following months, plaintiff's attorney, Vance, and defendant worked to get the underlying contract holders to approve the sale. Vance was also working to obtain consent from the underlying contract holders to extend the due date of a balloon payment that was due on June 1, 1998. Additionally, Vance prepared a second addendum to the earnest money agreement, which made the purchase of the property subject to this extension.

Before the closing, Parish, an escrow officer at Ticor Title who was handling the closing on the Prescott Property, contacted plaintiff regarding the amount of money that he was required to bring to the closing. Plaintiff believed that he was to bring less money than the amount that Parish quoted because of the security deposits. Plaintiff then spoke with defendant who assured plaintiff that the matter would be handled at the closing and that the amount of money required for closing would be reduced by the security deposits at that time.

Plaintiff, defendant, McIntosh, and the underlying contract holders arrived at the closing, on April 15, 1994, ready to close the deal. While discussing the issue of the tenants' security deposits, McIntosh indicated that some of the tenants had not paid their rent and that he was going to keep their security deposits. Plaintiff objected to this, and, when McIntosh refused to transfer the deposit money to him, plaintiff refused to close the sale until the parties resolved the issue. The underlying contract holders also failed to reach an agreement with plaintiff regarding the extension of the balloon payment. Plaintiff left the closing without signing the promissory note, the trust deed, or the sale contract or paying any down payment. As people were leaving the aborted closing, defendant told plaintiff that they would work something out and not to worry about it.

After plaintiff failed to perform at the scheduled closing, McIntosh refused to sell the property without obtaining a full release from the Brenneke Group for the amount that McIntosh was in default on the land sale contract. The underlying contract holders refused to proceed further with plaintiff in view of his previous failure to perform.

On April 26, 1994, defendant spoke with Barry Brenneke, an underlying contract holder whose consent was required for the sale. Because McIntosh was in default on the property at the time, Brenneke asked defendant if he was interested in purchasing the Prescott Property for himself.

On April 27, 1994, defendant wrote to plaintiff's attorney, Vance, describing four notes that plaintiff was to execute in order to close the sale. In the letter, defendant stated that he hoped they could go forward with the transaction and told Vance how much cash to bring to close the escrow. Despite the fact that the buyer-broker agreement had expired according to its terms on April 1, 1994, the parties continued to work together to close the transaction.

On April 28 or 29, 1994, defendant and plaintiff spoke again regarding plaintiff's purchase of the Prescott Property. Defendant said that he had been speaking with Brenneke and had worked out a deal whereby McIntosh would deed the Prescott Property back to Brenneke and then plaintiff could purchase the property from the Brenneke Group for $20,000 down plus defendant's commission. Defendant asked plaintiff to fax him a note stating that these terms were acceptable and then he would put together the rest. Plaintiff faxed him such a note on April 29, 1994.

Parrish, the escrow officer who was handling the closing, received a letter from McIntosh dated April 29, 1994, in which McIntosh purported to revoke his signature for escrow on the sale of the Prescott Property so that the deed could not be transferred or recorded without his approval.

On May 1, 1994, defendant wrote to plaintiff, terminating their buyer-broker relationship as of April 1, 1994. He faxed the termination letter to plaintiff the next day and mailed it to him on May 3, 1994. Plaintiff called defendant to speak with him about the purchase of the Prescott Property

on May 2, 1994, at which point defendant told him that he was going to buy the property himself. On May 1 or May 4, 1994, defendant prepared an earnest money agreement for the purchase of the Prescott Property for himself (the dates on the agreement reveal handwritten 4s over typed 1s). On May 2, 1994, defendant wrote a letter to Brenneke instructing him to include some items in his negotiations with McIntosh regarding the Prescott Property. That same day at 10:36 a.m., Brenneke faxed a note to defendant stating that he had "reviewed the earnest money and it looked ok." Defendant ultimately purchased the Prescott Property for himself on May 27, 1994. Both plaintiff and McIntosh signed a release of earnest money in June 1994 in order for the title company to return the earnest money to plaintiff.

On April 30, 1996, plaintiff filed this action alleging claims for breach of contract and breach of fiduciary duty against defendant. On January 14, 1997, after filing an answer, defendant moved for summary judgment on plaintiff's claims. He presented four grounds for seeking summary judgment: (1) plaintiff failed to perform the earnest money agreement; (2) plaintiff committed a prior material breach of the buyer-broker agreement; (3) plaintiff sustained no damages; and (4) plaintiff previously released his claims against defendant. In granting defendant's motion, the trial court focused on defendant's conduct, finding nothing that was adverse to or in conflict with plaintiff's interests during the time defendant represented plaintiff.[2] The court also found no evidence of damages.

On appeal, plaintiff argues that the trial court erred in granting the motion for summary judgment because there is a question of fact as to the actions taken by defendant before the termination of the buyer-broker agreement and of their adverse effect on plaintiff. He argues that defendant had a continuing duty to assist him in purchasing the Prescott Property and that when that duty ended is a question of fact for the jury. Plaintiff contends that a reasonable jury

---

[2] Defendant did not raise this ground in his motion for summary judgment. Although plaintiff pointed that fact out in his brief he did not object to the trial court's actions. Rather, in his brief, plaintiff responded to the trial court's decision on its merits.

could find that defendant began negotiations for his own pur-chase of the Prescott Property while he still owed a fiduciary duty to plaintiff. Plaintiff also argues that there are genuine issues of material fact concerning the damages he sustained as a result of defendant's purchase of the Prescott Property.

Defendant argues that the trial court's grounds for granting summary judgment were correct. In addition, he argues that plaintiff released any claims against him when plaintiff executed a document releasing the seller and his assigns from any liability. Plaintiff responds that the release for the return of his earnest money does not extend to any direct or indirect contractual relationship with defendant.

■ We first consider whether defendant may have acted adversely to plaintiff while representing him.[3] The buyer-broker agreement was to have terminated on April 1, 1994; however, a jury could find that the term of the agreement was extended by the conduct of the parties. In *Widing v. Jensen*, 231 Or 541, 373 P2d 661 (1962), the court examined a broker's contract that included a time of performance clause. The court stated:

> "A provision in a contract terminating it as of a given date * * * is for the benefit of the principal, and like all other provisions in favor of a party, may be waived if he chooses, either expressly or impliedly.

> "The time of performance specified in a broker's contract, as in other contracts, may be waived by the principal where he, after the time limit has expired, urges and encourages the broker to continue his efforts and the broker does so continue with the knowledge, approval and encouragement of the principal." *Id.* at 547 (citations omitted).

After the termination date of the buyer-broker agreement, plaintiff and defendant continued to work together to prepare for the closing that was to occur on April 15. Even after the closing failed, there were still conversations between plaintiff and defendant regarding plaintiff's purchase of the Prescott Property. Defendant wrote a letter

---

[3] Neither plaintiff nor defendant makes any argument on appeal concerning defendant's first two grounds supporting the motion for summary judgment in the trial court.

to plaintiff on May 1, 1994, terminating the buyer-broker agreement as of April 1, 1994. Defendant faxed it to plaintiff on May 2, 1994, and mailed it to him on May 3, 1994. The record does not show when plaintiff actually received the letter. Plaintiff telephoned defendant on May 2, 1994, to discuss plaintiff's purchase of the property, at which point defendant told plaintiff that he was buying the Prescott Property for himself. That certainly gave plaintiff notice that the relationship was terminated, as the buyer-broker agreement was specifically for the Prescott Property only. Defendant's duty to plaintiff may not have ended before May 2, 1994, but it is still unclear exactly when it did end. Therefore, a genuine issue of material fact exists as to when the relationship was actually terminated.

■■ Despite the fact that the parties conducted themselves as though the agreement was still in effect, on April 26, 1994, defendant had his first discussion with Brenneke regarding the purchase of the Prescott Property for himself. While the buyer-broker agreement does permit defendant to find other buyers for the property, that does not sanction self-dealing by defendant while he remained in a fiduciary capacity. *Starkweather v. Shaffer*, 262 Or 198, 203, 497 P2d 358 (1972). In conjunction with his fiduciary duty, defendant was also bound by the duty of good faith and fair dealing which is imposed in the performance and enforcement of every contract. *See Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 892 P2d 683 (1995); *Tolbert v. First National Bank*, 312 Or 485, 823 P2d 965 (1991). Plaintiff makes no argument that defendant's duty of good faith and fair dealing under the contract is any different than his fiduciary duty, and so we discuss them together.

A factfinder could decide that on May 1, 1994, before terminating his relationship with plaintiff, defendant drafted an earnest money agreement for the purchase of the Prescott Property for himself. The earnest money agreement appears to have been originally dated May 1 in several places and then the numeral "4" was written on top of the "1" in an apparent effort to make May 4 the effective date of defendant's offer. However, the clause in the earnest money agreement where defendant declares that he has deposited $1,000 in earnest money in trust to be placed in escrow pursuant to

his offer is expressly dated May 1 with an effort to change it. The following day, May 2, 1994, defendant received a fax from Brenneke approving the earnest money agreement and defendant sent a note to Brenneke making suggestions for the negotiations with McIntosh for the Prescott Property. Based on the fact that Brenneke approved the earnest money agreement, a juror could infer that defendant actually sent a copy of his earnest money agreement to Brenneke on May 1 or May 2, 1994. According to the earnest money agreement, he made a $1,000 deposit on it on May 1. Because we do not know when defendant actually terminated his relationship with plaintiff, drafted the earnest money agreement, or sent the earnest money agreement to Brenneke, a genuine issue of fact remains as to whether defendant acted adversely to plaintiff while still under a fiduciary duty to him.

■       As the moving party, defendant has the burden of establishing that there is no genuine issue of material fact with respect to the adverse effect of his conduct on plaintiff and that he is entitled to judgment as a matter of law. *Jones*, 325 Or at 420. That applies even to those issues that plaintiff would have the burden of proving at trial. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978). Defendant has not demonstrated that the buyer-broker agreement was terminated before he engaged in self-dealing. Defendant has offered no evidence regarding his response to Brenneke's question about purchasing the property himself. Whether and how defendant responded to Brenneke's inquiry may tend to show whether or not defendant was acting adversely to plaintiff. In addition, it is unclear from the record whether defendant terminated his relationship with plaintiff before or after drafting his own earnest money agreement and sending it to Brenneke for his approval. Because a factfinder could find that defendant drafted his own earnest money agreement on May 1 and that the buyer-broker agreement was not terminated before May 2, a factfinder could also find that defendant was engaged in self-dealing while still owing a fiduciary duty to plaintiff. Summary judgment was therefore inappropriate.

Despite the fact that we have found that summary judgment was inappropriate on the issue of liability, we will review defendant's two final grounds for summary judgment.

If in fact we find that plaintiff suffered no damages or that the release extends to claims arising out of the buyer-broker agreement, then we must find that summary judgment was appropriate.

■     We turn to the issue of damages. Plaintiff argues that he has been damaged by the lost profit he would have realized on the sale, as well as the loss of the rental income that the property generates. The burden is on defendant, as the moving party, to establish that there is no genuine issue of material fact with respect to damages. *Seeborg*, 284 Or at 699. Defendant has not shown that plaintiff suffered no loss of income or profits. There is a question of fact on the issue of damages that remains to be decided.

■     Defendant finally argues that plaintiff's claims are barred by a release that plaintiff signed on June 21, 1994. The release provides as follows:

> "I, the undersigned buyer in the above referenced transaction, hereby release all my right and interest in the earnest money agreement and the real property described therein and further release Ronald W. McIntosh and Betty J. McIntosh and their agents and assigns, from any liability in connection with the earnest money agreement and any liability arising out of related representation and negotiations."

A release agreement is a contract subject to construction and interpretation like any other contract. *Ristau v. Wescold, Inc.*, 318 Or 383, 387, 868 P2d 1331 (1994). We must first determine whether the terms of the contract are unambiguous. If they are, then "the construction of [the] contract is a question for the court and is treated as a matter of law." *Id.* (quoting *May v. Chicago Insurance Co.*, 260 Or 285, 292, 490 P2d 150 (1971)). There may, in certain circumstances, be questions for the finder of fact in the construction process.

> " 'If the language of the contract is ambiguous, or if technical words, terms of art, or local phrases are used, evidence showing the meaning or interpretation of the contract may be admitted. In such event, the jury should determine the intention of the parties.' " *May*, 260 Or at 292-93 (quoting *Libby Creek Logging, Inc. v. Johnson,* 225 Or 336, 339, 358 P2d 491 (1960)) (citations omitted).

The language of the release is ambiguous. It may mean that plaintiff releases defendant, as the buyer (an assignee of McIntosh), from any liability arising out of related representation or negotiations, including the buyer-broker agreement. On the other hand, it may be limited to the earnest money agreement and the Prescott Property and plaintiff's rights and claims thereto against McIntosh. Because the release is ambiguous, summary judgment was inappropriate on this ground as well.

Because there are questions of material fact on all of the grounds for summary judgment that defendant asserts on appeal, we reverse the judgment and remand the case to the trial court.

Reversed and remanded.