Argued and submitted February 15, 2006, affirmed April 25, 2007

## SPIRIT PARTNERS, LP,
*Appellant,*

*v.*

## STOEL RIVES LLP,
*Respondent.*

0211-11290; A125873

157 P3d 1194

Joseph M. Pastore argued the cause for appellant. On the opening brief were Timothy Quenelle, Joseph M. Pastore, and Brown Raysman Millstein Felder & Steiner, LLP. With him on the reply brief were Brown Raysman Millstein Felder & Steiner, LLP and Timothy Quenelle.

Joseph C. Arellano argued the cause for respondent. With him on the brief were Daniel L. Keppler, Melissa B. Kelleigh, and Kennedy, Watts, Arellano & Ricks LLP.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

ORTEGA, J.

---

* Landau, J., *vice* Ceniceros, S. J.

## ORTEGA, J.

This appeal arises from plaintiff's purchase of warrants in audiohighway.com ("Audiohighway"), a company that has declared bankruptcy. Plaintiff sued defendant, a law firm that represented the managing underwriter of Audiohighway's initial public offering, for fraud, negligent misrepresentation, and breach of fiduciary duties. Applying Oregon law, the trial court granted summary judgment to defendant on statute of limitations grounds. Plaintiff appeals, contending that the trial court erred in applying Oregon law rather than California law or, as to one claim, New York law; plaintiff also argues that, even if Oregon law applies, there is a genuine issue of material fact regarding when plaintiff discovered its claims against defendant.

We view the record in the light most favorable to plaintiff, the nonmoving party, and determine whether defendant was entitled to judgment as a matter of law. ORCP 47 C. Because we conclude that the trial court correctly applied Oregon's statute of limitations and that there is no genuine issue of material fact, we affirm.[1]

Most of the following facts are undisputed, although the parties have dramatically different views regarding the consequences of the facts. Audiohighway, a California corporation, engaged in an initial public offering (IPO) of its stock on the NASDAQ® stock market in 1998. Each unit sold consisted of one share of common stock and one warrant. Each warrant entitled its holder to purchase, during a certain period, one additional share of Audiohighway common stock for $9.75.

Audiohighway retained Paulson Investment Company (Paulson) as the managing underwriter for the IPO. Paulson's main office is in Portland, and it also has offices in California and New York. Paulson hired defendant, a law firm whose main office is in Portland, to represent the underwriters in the IPO. Audiohighway's preliminary prospectus, dated August 14, 1998, and its final prospectus, dated

---

[1] Our ruling on plaintiff's challenge to the application of the statute of limitations to bar its claims obviates the need to address plaintiff's other assignments of error.

December 17, 1998, both stated that certain legal matters in connection with the IPO would "be passed upon for the [u]nderwriters by [defendant], Portland, Oregon." Defendant's work with respect to the IPO was performed by persons who work from its Portland office. During the relevant time period, defendant had no California offices.

Audiohighway appointed U.S. Stock Transfer Corporation, a California corporation, to act as its warrant agent. Under the terms of the warrant agreement, the warrant agent was responsible for keeping records of the ownership of the warrants. The warrant agreement contained a choice-of-law provision stating that the warrant agreement and warrant certificates would be deemed California contracts and construed in accordance with California law. Like the final prospectus, the warrant agreement was dated December 17, 1998.

Plaintiff is a broker-dealer that specializes in trading warrants. Plaintiff identifies itself as a limited partnership organized under New York law, with its principal office in New York City. Plaintiff alleges that, before Audiohighway called the warrants, it had bought and sold Audiohighway warrants and held 44,200 warrants.

The dispute in this case revolves around the terms under which the warrants would be called. The warrant agreement provided that, when Audiohighway called the warrants, warrant holders would be required either to exercise their warrants to purchase stock or to allow Audiohighway to redeem the warrants at a price of 25 cents per warrant. Audiohighway's preliminary prospectus and the warrant agreement stated that the company could call its warrants if the stock price exceeded a certain price (identified in the preliminary prospectus only as 200 percent of the IPO price and specifically identified in the warrant agreement as $13) for 20 consecutive trading days. However, the final prospectus set different call provisions: it provided that warrants could be called if the stock price equaled or exceeded $13 for 10 calendar days. Thus, the call provision in the warrant agreement did not match that in the final prospectus.

Audiohighway's IPO took place on December 18, 1998. In an e-mail message dated January 14, 1999 (" 'fix it'

e-mail"), Audiohighway's counsel wrote to an attorney in defendant law firm who had worked on the matter:

"In reviewing the copy of the [w]arrant [a]greement * * *, I see that the redemption provision was never updated to reflect the final deal: It should read that [Audiohighway] may call the [w]arrants if the Daily Price (defined as the closing bid) equals or exceeds $13.00 (200% of the IPO price) for 10 consecutive days. I think we should fix it so that the [w]arrant [a]greement in the final documents is correct. * * * Could you please take care of that and send it around to Grant and [the warrant agent], with a copy to me? Thanks much."

The attorney changed the warrant agreement accordingly.

The attorney described the change as unexceptional "post closing cleanup." In plaintiff's view, however, the change was made without following applicable amendment procedures and was a significant misrepresentation that forms the basis of all of plaintiff's claims. In keeping with those divergent views, plaintiff refers to the document including the change as "the Backdated Warrant Agreement," and defendant refers to it as "the corrected warrant agreement." Preferring a less loaded term, we refer to it as "the disputed warrant agreement."

On January 20, 1999, Audiohighway announced that it was calling the warrants. By the terms of the warrant call, warrants were to be exercised by delivery of the warrant certificates and payment to the warrant agent in California. Plaintiff sought to stop the call based on objections to the 10-day call provision. However, plaintiff was at that point unaware that a change had been made to the original warrant agreement; its objections were based on claimed defects in the change from the 20-trading-day call provision in the preliminary prospectus to the 10-calendar-day provision in the final prospectus and on an alleged ambiguity in the 10-day provision. After plaintiff obtained from Audiohighway a copy of the disputed warrant agreement (which was not yet disputed), indicating that the 10-day provision controlled, plaintiff went ahead and exercised its warrants rather than continuing with efforts to stop the call. Plaintiff now contends that, if it had realized that the original warrant agreement

contained a 20-day call provision, "it would have easily halted the warrant call in Federal Court in New York."

After the warrants were called, plaintiff sued Audio-highway in federal court in New York for breach of contract and other claims relating to the warrant call. In December 1999, in response to a subpoena from plaintiff, defendant produced a copy of the "fix it" e-mail. A letter from plaintiff's counsel to Audiohighway's counsel dated January 6, 2000 (the January 2000 letter), asserts, "We are confident that this e-mail along with other documentation we have found demonstrates the impropriety of the [w]arrant [c]all." From that point on, representatives of plaintiff identified the "fix it" e-mail in depositions as evidence of improper conduct by defendant. For example, one of plaintiff's representatives testified that, although he was not initially sure of the full import of the e-mail, he believed that it was "fishy" from the first time he saw it. In July 2000, plaintiff amended its complaint in its federal action against Audiohighway to allege fraud, citing the "fix it" e-mail. In its complaint in this action, plaintiff alleged that it "did not know of the conduct of [defendant] until on or after November 8, 1999 [the date of the subpoena to defendant,] when [plaintiff] received discovery in another action containing the email which revealed [defendant's] complicity in the conspiracy alleged herein."

In January 2001, Audiohighway declared bankruptcy, resulting in a stay of plaintiff's lawsuit against it. Later that year, plaintiff sued Paulson. In December 2001, Paulson filed a statement of claim for declaratory relief with the National Association of Securities Dealers, stating that it "was not involved in backdating or amending the warrant agreement (at most, Paulson's outside lawyers were involved)," that it had not been copied on the "fix it" e-mail, and that the e-mail "does not even support a finding of intentional fraud by the lawyers themselves." Plaintiff now contends that it did not understand defendant's involvement in the disputed warrant agreement until Paulson filed that statement.

On November 7, 2002, plaintiff filed a state court action against defendant in Oregon. In March 2004, the trial court granted summary judgment for defendant, concluding

that Oregon law applied and that plaintiff's claims were barred by the applicable statute of limitations. In addressing plaintiff's contention that California law applied to its claims, the trial court emphasized that neither party had any presence in California and that the alleged misconduct occurred in Oregon, at defendant's offices in Portland.

Plaintiff appeals, arguing that California law applies or, in the alternative and as to the fraud claim only, that New York law applies. Plaintiff also contends that, even if Oregon law applies, the trial court erred by granting summary judgment, because there are genuine issues of material fact regarding when the statute of limitations began to run. Defendant responds that the trial court was correct to apply Oregon law and to grant summary judgment.

To determine which statute of limitations applies, we apply Oregon's conflict-of-law principles to determine which state's law is the basis of plaintiff's claims. ORS 12.430; *Cropp v. Interstate Distributor Co.*, 129 Or App 510, 513-14, 880 P2d 464, *rev den*, 320 Or 407 (1994). The threshold question in a choice-of-law problem is whether the laws of the different states actually conflict. *Machado-Miller v. Mersereau & Shannon, LLP*, 180 Or App 586, 591, 43 P3d 1207 (2002) (citing *Lilienthal v. Kaufman*, 239 Or 1, 395 P2d 543 (1964)). The proponent of the law of another forum has the obligation to identify material differences between the applicable law of Oregon and of the other forum. *Waller v. Auto-Owners Ins. Co.*, 174 Or App 471, 475, 26 P3d 845 (2001).

Here, an actual conflict between Oregon and California law has been identified. At least some of plaintiff's claims would be timely under California law but, as we discuss below, there is no genuine issue of material fact regarding the untimeliness of plaintiff's claims under Oregon law.

As between Oregon and New York law, however, plaintiff did not adequately identify material differences in the applicable laws or preserve its arguments for our review. Simply introducing evidence of plaintiff's connections to New York, without argument about the application of New York law, is not sufficient. As we observed in *Roseburg Investments, LLC v. House of Fabrics, Inc.*, 166 Or App 158,

164, 995 P2d 1228 (2000), "the mere introduction of evidence [does not] preserve[ ] a legal theory that was not prosecuted to the trial court." (Citation omitted.) Rather, "a party must present its position with such specificity that the trial court 'can identify its alleged error with enough clarity to permit it to consider and correct the error immediately.'" *State v. Rumler*, 199 Or App 32, 41, 110 P3d 115 (2005) (quoting *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000)).

■    Although plaintiff now asserts that the trial court "ignored" New York's statute of limitations for negligent misrepresentation and breach of fiduciary duty claims, plaintiff never argued to the trial court that New York law applied to those claims and never even identified what the statutes of limitations for those claims would be under New York law. In addition, plaintiff does not assign error to the trial court's failure to apply New York law to those claims. We therefore do not consider any argument that New York law governs the negligent misrepresentation and breach of fiduciary duty claims. ORAP 5.45(1).

Although plaintiff briefly referred the trial court to New York's statute of limitations for fraud claims, plaintiff did not make sufficient argument to preserve that issue. In its complaint, plaintiff specifically and repeatedly asserted that California law governs the case, with no mention of New York law's applicability. Some 16 months after filing its complaint, plaintiff asserted in a footnote to its 35-page response to defendant's motion for summary judgment that New York's six-year statute of limitations for fraud claims might apply.[2] However, the bulk of the response memorandum

---

[2] The footnote, in its entirety, stated:

"Alternatively, as [d]efendant points out in its Motion for Summary Judgment, a close relationship exists between the transaction and New York. As [d]efendant has elaborated, the [p]laintiff is in New York, purchased the securities on a national market in New York, and was defrauded and damaged while in New York. Additionally, Paulson is located in New York. The relationship with New York is closer than the relationship with Oregon. Incidentally, the court in the Federal Action [against Audiohighway] recently applied New York's Civil Practice Law and Rules § 213(8) six[-]year statute of limitations to the fraud claim. Generally, fraud laws are in place to protect the innocent victims as the Oregon Supreme Court points out in [*Lilienthal*, 239 Or at 15], a case relied on by [defendant]. 'The law is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked.' *Id.* citations omitted. New York's fraud laws are intended to protect victims of fraud in New York."

addressed California law. Indeed, the footnote referring to New York appeared in a section of plaintiff's memorandum entitled, **"CALIFORNIA LAW GOVERNS PLAINTIFF'S CLAIMS FOR FRAUD."** (Uppercase and boldface in original.) At the hearing on defendant's motion for summary judgment, plaintiff's counsel argued for the application of California law while making a few references to "California law or New York law." Eventually, this exchange took place:

> "THE COURT: You don't claim that New York law applies.

> "[PLAINTIFF'S COUNSEL]: Actually, we believe, Your Honor, a choice of law issue is not so much a matter of pleading, although we did plead in this case that California law applies, and we have asserted in a footnote, just to bring to the Court's attention, that either forum, New York or California's law would apply, and in either instance this complaint was timely filed.

> "So, yes, we do assert that New York's law could apply as easily as California's. Though we think that, as you examine the situation, there are more contacts with California than there are with New York, though there certainly are many contacts with New York."

The discussion then returned to the application of California law. Plaintiff made no effort to explain the elements of a fraud claim under New York law or to elaborate on the applicability of New York law. In its oral ruling on summary judgment, the trial court addressed Oregon and California law, concluding that Oregon law applied. The court made no mention of New York law, and plaintiff said nothing about New York law or the lack of any explicit ruling regarding New York law.

We conclude that plaintiff's stated desire "just to bring to the [trial c]ourt's attention" the possibility that New York law might apply was insufficient to alert the court to

---

(Record citation omitted.) At the end of that section of plaintiff's memorandum, plaintiff also stated that the case had "closer connections to California and New York. Clearly both California and New York have a greater interest in protecting California and New York fraud victims than does Oregon. This is particularly true because the wrongful conduct involves changes to a California contract, the [w]arrant [a]greement." (Footnote omitted.)

plaintiff's present argument that the court erred by not applying New York law, particularly in light of plaintiff's obligation, as the proponent of the applicability of New York law, to identify material differences between New York and Oregon law. *Cf. Hughes v. PeaceHealth,* 204 Or App 614, 624, 131 P3d 798, *rev allowed,* 341 Or 140 (2006) (a single sentence asserting that a statute was invalid, without supporting argument, was insufficient to preserve that argument for appeal). The trial court here would no doubt feel "blindsided," *Rumler,* 199 Or App at 41, if we were to reverse its decision based on the applicability of New York law. Accordingly, we do not consider that argument.

■　We turn to the question that is presented for our review: whether California or Oregon law applies. We apply the "most significant relationship" approach of the *Restatement (Second) of Conflict of Laws* (1971) to tort claims. *Erwin v. Thomas,* 264 Or 454, 456, 506 P2d 494 (1973) (quoting *Restatement* at §§ 6, 145); *Portland Trailer & Equipment v. A-1 Freeman Moving,* 182 Or App 347, 358, 49 P3d 803 (2002). That approach requires us to consider "which state has the most significant relationship to the parties and the transaction, and [to determine] whether the interests of Oregon are so important that we should not apply [another state's] law, despite its significant connection with the transaction." *Stricklin v. Soued,* 147 Or App 399, 404, 936 P2d 398, *rev den,* 326 Or 58 (1997) (citing *Lilienthal*; further citation omitted); *see also Frost v. Lotspeich,* 175 Or App 163, 188-90, 30 P3d 1185 (2001) (applying that test).

Here, plaintiff contends that California has the most significant contacts. Plaintiff relies heavily on the warrant agreement's provision that it is made under the laws of California and is to be construed in accordance with those laws. Plaintiff also argues that California contacts exist because Audiohighway, which directed defendant to change the warrant agreement and which issued the warrant call, is a California company and that plaintiff's "only connection" to defendant is through California. In addition, plaintiff contends that California has a greater interest in this case because it involves preventing alteration of a California contract and protecting investors from fraud by California companies.

In defendant's view, on the other hand, California's contacts with this case are almost nonexistent. Defendant contends that the warrant agreement's choice of law provision is irrelevant because plaintiff does not assert a breach of contract claim and neither defendant nor plaintiff was a party to that contract in any event. Defendant argues that Audiohighway's presence in California is irrelevant because Audiohighway's liability is not at issue; plaintiff's claims arise from conduct by defendant, an Oregon law firm, while providing services to Paulson, an Oregon company. According to defendant, this case is about the regulation of Oregon lawyers providing services to Oregon clients.

We agree with defendant that Oregon's contacts with the parties and the transaction are more significant than California's. In examining the relative contacts, we find guidance in the *Restatement* section 148(2):

"When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

"(a)  the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

"(b)  the place where the plaintiff received the representations,

"(c)  the place where the defendant made the representations,

"(d)  the domicil, residence, nationality, place of incorporation and place of business of the parties,

"(e)  place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

"(f)  the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant."

Comment c to that section notes that, because determining the place of loss in fraud and misrepresentation cases can be difficult, the place of loss is less important in such cases. The place where the false representation is made, on the other hand, is an important contact. *Restatement* § 148 comment h.

Although not formally adopted by the Oregon Supreme Court, *Restatement* section 148 is a useful guide for resolving conflicts of law in this context. *See Western Energy, Inc. v. Georgia-Pacific*, 55 Or App 138, 146-47, 637 P2d 223 (1981) (applying that section and concluding that Louisiana law applied where the plaintiff's actions in reliance on the representations at issue occurred primarily in Louisiana, the plaintiff received most of the representations in Louisiana, the defendant made its representations in Louisiana, and the plaintiff was to perform by delivering fuel in Louisiana). Here, of the factors identified in the *Restatement*, only section 148(2)(f) could involve a California contact, as plaintiff was to exercise its warrants through the warrant agent in California. Plaintiff contends, however, that "subsection (f) does not apply because [defendant's] fraud occurred after [p]laintiff had already entered into the contract."

■ None of the other pertinent factors involves contacts with California. The only ties to California involve nonparties and a contract (the warrant agreement) that is not the basis for any of plaintiff's claims. Although Audiohighway and its warrant agent were both California corporations, the parties here are not from California, nor did their conduct occur in that state. Likewise, plaintiff's reliance on the warrant agreement's choice-of-law provision is unavailing, given that this case does not involve construction of the warrant agreement.

On the other hand, important contacts do exist between Oregon and the parties and transaction at issue. Defendant's main office is in Oregon. *See Restatement* § 148(2)(d). More importantly, the representation at issue here—defendant's change to the warrant agreement—was made in Oregon. *See id.* at § 148(2)(c). The fact that plaintiff later received the disputed warrant agreement from Audiohighway does not somehow alter the location of defendant's

conduct. And although plaintiff emphasizes that Audiohighway initiated the change through its counsel's e-mail to defendant, it is undisputed that the change was made by defendant in Oregon, where defendant's main office is located. Those contacts weigh in favor of application of Oregon law. Given the relative lack of significant contacts between California and the parties and transaction at issue here, we conclude that Oregon has more significant contacts and that Oregon law applies.

Comparing the relative interests of Oregon and California in this action does not change our conclusion. *Frost*, 175 Or App at 189-90, is instructive. *But see Machado-Miller*, 180 Or App at 596 (recognizing the conceptual difficulties inherent in identifying and weighing such interests). In *Frost*, we considered whether to apply Oregon or California law to a fee-division dispute between a California lawyer and an Oregon lawyer. The "significant relationship" test did not yield a clear result.[3] Comparing the relative interests, we concluded that California law applied because "California's interest in regulating, and sanctioning, the conduct of California attorneys who circumvent rules designed to protect California clients outweighs Oregon's interest in upholding contracts generally." 175 Or App at 190. Here, by comparison, plaintiff alleges fraud, negligent misrepresentation, and breach of fiduciary duty, all based on conduct in Oregon by an Oregon law firm. Oregon has a substantial interest in regulating the conduct of Oregon lawyers. California, however, has little interest in regulating conduct in Oregon by an Oregon law firm that allegedly harmed a New York partnership. Accordingly, Oregon law applies to this dispute.

We turn to the application of the statute of limitations to plaintiff's claims under Oregon law. The limitation period for all three claims—fraud, negligent misrepresentation, and breach of fiduciary duty—is two years, subject to a discovery rule. ORS 12.110(1); *Oregon Life and Health v.*

---

[3] In *Frost*, at the time that the lawyers entered into a fee-division agreement, one lawyer was an Oregon resident and one lawyer was a California resident. At least two of the three clients were former Oregon residents who had become California residents. The fees were based on the rendition of legal services in Oregon and California. 175 Or App at 189.

*Inter-Regional Financial*, 156 Or App 485, 491-92, 967 P2d 880 (1998), *rev withdrawn*, 329 Or 10 (1999). We have summarized the discovery rule for the claims as follows:

> "In making a determination as to when [a] plaintiff 'discovered' its negligence and breach of fiduciary duty claims, we must determine whether, under the circumstances, [the] plaintiff knew or, in the exercise of reasonable care, should have known 'facts which would make a reasonable person aware of a substantial possibility that each of the three elements [of legally cognizable harm] (harm, causation, and tortious conduct) exists.' *Gaston* [*v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994)]. That test is an objective one and here, as in most cases, concerns what [the] plaintiff should have known under the circumstances. *Id*.
>
> "As to the fraud claims, the analysis 'is essentially similar, except that the actual or inquiry knowledge that a plaintiff must have in order to start the running of the statute has sometimes been described as including the fact of the fraud itself.' *Widing v. Schwabe, Williamson & Wyatt*, 154 Or App 276, 283, 961 P2d 889 (1998)."

*Oregon Life and Health*, 156 Or App at 492 (third brackets in original). However, where all such claims are based on the same underlying representation and where the plaintiff has knowledge of the representation's falsity, the differences in the discovery rule are not material. *Id*. Because plaintiff's claims here all are based on the same representation (the disputed warrant agreement) and plaintiff knew of that representation's falsity, there is no material difference in the discovery rule for each claim.

■ Viewing the record in the light most favorable to plaintiff, we conclude that plaintiff had the information necessary to discover its claims more than two years before it filed this action against defendant. According to the complaint, plaintiff did not know of defendant's conduct "until * * * [it] received discovery in another action containing the email which revealed [defendant's] complicity in the conspiracy alleged herein." Consistently with that allegation, plaintiff's representatives identified the "fix it" e-mail in depositions as evidence that made them believe that defendant had participated in something "fishy" and was culpable. Although plaintiff contends that the e-mail "was buried in hundreds of

pages of documents," plaintiff nevertheless was well aware of the e-mail's contents by January 2000, when plaintiff's counsel wrote to Audiohighway's counsel that the "fix it" e-mail was evidence of wrongdoing. Thus, even assuming that the limitations period did not begin to run until plaintiff actually perused the "fix it" e-mail, the statute of limitations began to run no later than January 2000. Because plaintiff did not file its complaint within two years of that time, the trial court did not err in granting summary judgment to defendant.

Affirmed.