Argued and submitted March 14, judgment vacated; findings and conclusions vacated in their entirety; remanded for further proceedings July 5, 2001

Marianne FROST
and Brooke Conner,
Guardians Ad Litem for
Zachary Conner, a Minor,
*Plaintiffs,*

*v.*

Kurt LOTSPEICH,
Laura Lotspeich, Martin A. Lotspeich
and Does I through X, inclusive,
*Defendants.*

Marianne FROST
and Mike Conner,
*Plaintiffs,*

*v.*

Kurt LOTSPEICH,
Laura Lotspeich, Martin A. Lotspeich
and Does I through X, inclusive,
*Defendants.*

Timothy J.P. O'CONNOR,
former attorney for
Marianne Frost and Brooke Conner,
Guardians Ad Litem and Conservators for
Zachary Conner, a Minor,
*Appellant,*

*v.*

Michael BRIAN,
current attorney for
Marianne Frost and Brooke Conner,
Guardians Ad Litem and Conservators for
Zachary Conner, a Minor,
*Respondent.*

95-2907-L-1; 95-4397-L-3; A102685 (Control)

In the Matter of the Conservatorship for
Zachary Conner, a Minor.

Timothy J.P. O'CONNOR,
former attorney for
Marianne Frost, Brooke Conner, and Mike Conner,

Guardians Ad Litem and Conservators for
Zachary Conner, a Minor,
*Appellant,*

*v.*

Michael BRIAN,
current attorney for
Marianne Frost, Brooke Conner, Mike Conner,
Guardians Ad Litem and Conservators for
Zachary Conner, a Minor,
*Respondent.*

93-132G0; A102686
(Cases Consolidated)

30 P3d 1185

Clayton C. Patrick argued the cause and filed the briefs for appellant.

Gary L. Simms argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Wollheim, Judge, and Van Hoomissen, Senior Judge.

HASELTON, P. J.

**HASELTON, P. J.**

This appeal arises from a dispute between two attorneys over the division of fees generated from the settlement of the underlying personal injury action. Appellant Timothy O'Connor, a California lawyer, assigns error to several rulings including, most significantly: (1) the trial court's preclusion of O'Connor's participation by telephone in an evidentiary hearing on the fee dispute because of O'Connor's conduct during that proceeding; (2) the trial court's determination that a written fee-division agreement between O'Connor and respondent, Michael Brian, a Medford lawyer, was unenforceable as violating both California and Oregon attorney disciplinary rules; and (3) the trial court's determination that, as a reasonable fee for his services, O'Connor should receive $13,600 out of the total contingency fee and cost award of $156,874.73.

We conclude that the trial court erred in summarily precluding O'Connor's participation in the evidentiary hearing. That action effectively defaulted O'Connor and, in the totality of the circumstances, exceeded the limits of the court's legal authority. Because the effects of that error pervade the trial court's findings and conclusions, we remand for an entirely new evidentiary hearing pertaining to the enforceability of the fee-division agreement and, if necessary, the reasonable value of O'Connor's services. Finally, for purposes of guidance on remand, we conclude that, if the evidence on remand establishes a violation of California Rule of Professional Conduct 2-200(A), under choice of law principles, that violation would bar enforcement in this proceeding of the attorneys' fee-division agreement.

Except as specifically noted, the following material facts are undisputed: In October 1993, Zachary Conner was severely injured when a shotgun held by Kurt Lotspeich accidentally discharged at the Lotspeichs' home in Talent, Oregon. At that time, Zachary and Kurt were both 13 years old, and both boys, as well as their parents, were Oregon residents.

In November 1993, Zachary's parents, Marianne Frost and Mike Conner, hired Brian to represent both themselves and Zachary in any claims arising out of the accident. In December 1993, Brian sought and established a conservatorship for Zachary, with Frost and Conner as coconservators. In 1994, after Brian had undertaken some investigation but before any personal injury action was filed, Frost and Zachary moved to California. At some point thereafter, Frost and Conner discharged Brian and retained O'Connor to represent both them and Zachary.

On June 28, 1994, O'Connor sent Brian a letter addressing division of fees with respect to any personal injury recovery:

> "This letter confirms our June 28, 1994 teleconference wherein we agreed that the compensation for our respective firms shall be divided in accordance with the proportionate amounts of work performed by our respective firms.

> "The proportionate amounts shall be determined by comparing the amount of hours of work performed by our respective firms. For example, if your firm has performed 9 hours of work, and my firm has performed 13 hours of work, then the fee shall be divided as 9/22 to your firm and 13/22 to my firm.

> "We concluded our fee discussion with your stating that any referral fees owed to Pat Craine will be paid by your office and paid solely out of your proportionate fee (eg., [sic] out of your 9/22). I agreed.

> "You stated that the file will be copied in the near future and then sent to my office sometime next week. I shall contact you upon my receipt of the files to confirm delivery."

The letter indicated that copies were sent to Frost and Conner. On July 8, Brian, by letter, confirmed the agreement.

In October 1994, Frost and Conner executed a written contingency fee agreement with O'Connor. In the same month, O'Connor filed two actions against the Lotspeichs in California state court—one with Zachary as plaintiff, and one with Frost and Conner as plaintiffs. The first case was dismissed for lack of personal jurisdiction, and the second was

voluntarily dismissed with prejudice. O'Connor subsequently filed an action on behalf of Frost and Conner in California federal district court. That action was also dismissed for lack of personal jurisdiction. Finally, in July 1995, O'Connor, through a Medford attorney, filed a personal injury action in Jackson County Circuit Court on behalf of Frost and Conner as Zachary's guardians ad litem.[1] At that time, O'Connor was granted admission *pro hac vice* to represent the plaintiffs in the Jackson County action.

In August 1995, Frost and Conner discharged O'Connor. On August 18, Brian filed an attorney lien in the Jackson County personal injury action, basing his claim of lien on the June 28, 1994, letter agreement with O'Connor. On September 5, 1995, O'Connor filed a lien for attorney fees against any judgment in the Jackson County action.[2]

Frost and Conner subsequently retained several other California attorneys, who associated various Oregon attorneys, none of whom resolved the Jackson County litigation, which had initially been the subject of intensive motion practice but then had languished. Finally, in January 1997, Brian was in Jackson County Circuit Court on an unrelated matter, when he heard that the court was about to dismiss the personal injury action for lack of prosecution. Realizing that no one was present to oppose the motion, Brian persuaded the trial court not to dismiss the case. Thereafter, Frost and Conner retained Brian once again.

After being rehired, Brian negotiated a $500,000 policy-limits settlement with the Lotspeichs' liability insurer. On March 20, 1998, the court in the conservatorship proceeding authorized Frost and Conner, as Zachary's conservators, to execute that settlement.

In an effort to resolve O'Connor's claims to fees, Brian contacted O'Connor. When those efforts failed, Brian obtained an order to show cause why O'Connor's lien should

---

[1] That action, Jackson County Circuit Court case No. 95-2907-L-1, was subsequently consolidated with another action, Jackson County case No. 95-4397-L-3, which Frost and Conner brought in their personal capacities. The appellate record does not disclose the precise nature of the claims in the latter action.

[2] On the same day, O'Connor also filed a notice of lien in the Jackson County conservatorship proceedings.

not be discharged. O'Connor responded to the court's show cause order by submitting a copy of the June 28, 1994, fee-division letter, as well as time sheets representing that he had devoted 181.42 hours to representing Zachary and his parents.

On April 8, 1998, the court issued an order approving payment by the conservatorship of $149,366.19 in attorney fees and $7,508.54 in costs pursuant to a written contingency fee agreement between Brian and Frost and Conner. That order did not, however, address O'Connor's entitlement to fees—and, particularly, the effect of the June 28, 1994, fee-division letter. The court subsequently issued an order discharging and holding "for naught" O'Connor's attorney fee lien. At the same time, however, the court set a hearing "to determine the amount of reasonable compensation and advances" to which O'Connor was entitled.

On May 18, 1998, that hearing occurred. Counsel for Brian argued that the June 1994 fee-division letter was unenforceable and stated that he intended to present testimony from Brian and three other attorney witnesses who would render opinions as to the reasonableness of O'Connor's claimed fees. O'Connor, who represented himself, participated by telephone and made an opening statement in which he argued, primarily, that the division of fees was controlled by the June 1994 agreement. Immediately after oral arguments, and before Brian's witnesses testified, the following colloquy between the court and O'Connor occurred:

> "THE COURT: Thank you [Mr. O'Connor]. I'm cutting you off. I hope that's not clear [*sic*]. *I don't know how much clearer I have to say it. I need to get some testimony on here. You can raise your legal arguments either by brief, if you wish to submit them at the end, or make them—make the legal arguments at the end of the hearing. Right now I want to proceed ahead and start the hearing.*
>
> "O'CONNOR: Your Honor, I'm objecting to the hearing.
>
> "THE COURT: Thank you very much, sir.
>
> "O'CONNOR: (inaudible)

"THE COURT: Mr. Carter you may call your first witness.

"O'CONNOR: I believe that the Court needs to know my position that—

"THE COURT: Call your first witness, sir.

"CARTER: Dennis Black.

"O'CONNOR: —(inaudible) to discuss the issue of how much money—

"THE COURT: *Okay. Mr. O'Connor, if you choose to keep speaking I'm going to speak right over you and you're not going to get it on the tape recording. So, I've made my ruling and I wish then to follow the Court's order in this regard. Go ahead and receive*

"O'CONNOR: Your Honor, (inaudible)—

"THE COURT: *I'm not asking for any further comments. Be quiet. I will tell you when it's your turn to speak.*

"O'CONNOR: I believe, your Honor, that the—

"THE COURT: Go ahead, sir.

"THE CLERK: Do you solemnly swear or affirm—

"O'CONNOR: (inaudible) professional respect—

"THE CLERK: —the testimony you shall give—

"O'CONNOR: —works both ways, from my office and to the bench.

"THE CLERK: —will be the truth, the whole truth, and nothing but the truth?

"THE WITNESS: I do.

"O'CONNOR: I believe, your Honor—

"THE COURT: Please have a seat sir.

"O'CONNOR: —(inaudible) there's not a court reporter yet? Is that what I understand from that last question, your Honor?

"THE COURT: Would you please state your full name and spell your last?

"THE WITNESS: Dennis H. Black. B-L-A-C-K.

"\* \* \* \* \*

"Q. [By Brian's Attorney, Carter]: Mr. Black, what is your occupation sir?

"O'CONNOR: Your Honor, I object to this hearing, in the manner it's being conducted.

"THE COURT: Thank you sir. I note your objection—

"O'CONNOR: (inaudible) being recorded by a Court reporter—(inaudible) my comments on that record.

"THE COURT: I note your objection and it's overruled. Thank you.

"O'CONNOR: I'm not finished with my objection, so your overruling is premature.

"THE COURT: Okay. Thank you. You may ask your first question sir.

"O'CONNOR: Your Honor, I'm not finished with my objection.

"THE COURT: *Okay. If this keeps going, I'm going to say that your behavior has been unruly. You're not abiding by the court's rule. I'm going to hang up the phone on you.*

"O'CONNOR: Your Honor, I'm not sure what the Court's ruling is. It states that—

"THE COURT: *Do you understand my ruling? What I just said to you about me hanging up the phone?*

"O'CONNOR: I do not understand, your Honor.

"(Phone being hung up)

"THE COURT: He is—I have taken him off the record. He is not complying. He's going to just keep talking. We'll have the hearing, it'll be recorded. We will do as we can. But I'm not going to put up with that further. Go ahead." (Emphasis added.)

The court then conducted the hearing—receiving testimony from Brian and the three attorney witnesses who testified on his behalf, admitting exhibits, and entertaining argument from Brian and his counsel—all without O'Connor's participation. At the end of the hearing, the court rendered an oral finding that O'Connor was "entitled to

reasonable compensation" of $13,600 from the total contingent fee awarded pursuant to the contingent fee agreement. The court, in so concluding, observed:

> "Well, we need to be worried too about the validity of the hearing. I cut him off. He would not stop. He would not follow. Had he been present I would have held him in contempt of Court and removed him. He would not abide by any of my rules. I could not get him to stop. But, that—we did—do have a problem with that act. Whether or not that's going to require us to make a record of this and perhaps give him an additional opportunity to be heard. If he can somehow convince me that he can mind his manners enough and be professional enough to get some coherent statement in front of the Court. I don't know if he'd be able to do that or would choose to do that."[3]

On June 3, 1998, the court issued a detailed 22-page "Final Judgment Regarding Entitlement to Attorney's Fees with Findings of Fact and Conclusions of Law." The court made several determinations that are central to this appeal. *First*, the court held that the June 1994 fee-division agreement was unenforceable for several reasons, including: (1) if enforced literally, the agreement would permit O'Connor to recover an "excessive" fee in violation of Oregon DR-2-106 and California Rule of Profession Conduct 4-200(A); (2) the agreement was not ratified by the clients, in violation of California Rule of Professional Conduct 2-200(A)(1); (3) construction and enforcement of the agreement to require compensation for all hours of representation, without regard for the reasonableness of the time and services, would be objectively unreasonable and would violate precepts of good faith and fair dealing;[4] and (4) O'Connor had rescinded the agreement.

---

[3] There is no indication in the record that the trial court ever afforded O'Connor such an opportunity before issuing its final judgment.

[4] In so concluding, the court accepted Brian's argument that to enforce the agreement literally as basing compensation on a pure "hours-devoted" proportional basis would promote and reward the rendition of nonbeneficial, or even frivolous, services.

*Second,* the court concluded that, given the unenforceability of the June 1994 agreement, O'Connor was necessarily limited to recovering only the reasonable value of his services. The court determined that value to be $13,600.

■ *Third,* the court concluded that it "had good and sufficient cause" to terminate O'Connor's telephonic participation in the May 18, 1998, hearing:

> "O'Connor's behavior was disrespectful to the court and bordered on the contemptuous. His misconduct also probably prevented the preparation of an accurate Reporter's Transcript because—despite the court's warnings— O'Connor continued to interrupt the court and speak simultaneously with the court. The Reporter's Transcript will reflect as best as it can under the circumstances what O'Connor said, but it will not reflect his tone or demeanor. The court therefore observes that O'Connor was excessively argumentative and angry in tone as well as substance. To preserve the integrity of the judicial process and to insure an orderly proceeding, this court was well within its discretion when it terminated O'Connor's participation in the hearing."

On appeal, O'Connor assigns error to those rulings and argues that the court impermissibly terminated his participation in the evidentiary hearing and that the fee-division agreement should be enforced literally. As amplified below, we conclude that the trial court erred in receiving evidence, considering arguments, and rendering judgment after terminating O'Connor's participation in the fee hearing. That error necessitates a remand for an entirely new evidentiary hearing—*i.e.*, for the trial court to "start from scratch." That disposition, in turn, largely obviates our consideration of O'Connor's remaining arguments challenging the trial court's findings and conclusions, because those determinations must be vacated as being based on an erroneously "one-sided" record.[5]

---

[5] For guidance on remand—and because the matter could well be dispositive— we do, however, address O'Connor's contention that, even if the evidence establishes a violation of California rule 2-200(A)(1), that violation would not render the June 1994 fee agreement unenforceable. We reject O'Connor's arguments in that regard. *See* 175 Or App at 181-91.

The trial court's preclusion of O'Connor's participation was tantamount to the entry of a default. O'Connor could not object to the testimony of Brian or the other witnesses, cross-examine Brian or the other witnesses, present evidence, including his own testimony, or respond to Brian's closing argument. Indeed, O'Connor was precluded from even *hearing* Brian's evidence and arguments. An adversarial proceeding became *ex parte*. The sanction was absolute.

Conversely, the trial judge's exasperation was understandable. O'Connor was obstreperous and provocative. Despite repeated admonitions by the court, O'Connor persisted in impairing the orderly conduct of the proceeding.

The trial court had to do *something*. We readily acknowledge that it is all too easy for an appellate court, from a distance of months and miles, to second-guess a trial court's on-the-spot response to a difficult, rapidly deteriorating situation. We are most reluctant to do so. But here, with respect, the trial court's response exceeded the legal limits of its authority.

The trial court identified no specific source of authority for its action, other than to assert, generally, that it was necessary "to preserve the integrity of the judicial process and to ensure an orderly proceeding." So justified, the court's action was, arguably, predicated on either of two sources of authority: (1) statutory authority to enforce order in judicial proceedings via the contempt power, including the summary imposition of sanctions for contempt, *see* ORS 1.240; ORS 1.250; ORS 33.096; and ORS 33.105(3); or (2) the court's "inherent" authority to regulate the conduct of proceedings.[6] The court's preclusion of O'Connor's participation exceeded the limits of authority derived under either of those sources.

All courts have the power to preserve and enforce order in judicial proceedings. ORS 1.240(1). "For the effectual exercise of the powers specified in ORS 1.240, a judicial officer may punish for contempt, in the cases and manner provided by statute." ORS 1.250. Under ORS 33.025(1), "[t]he power of a court to impose a remedial or punitive sanction for

---

[6] The parties offer no assistance in this regard, and our research has not yielded any other colorable source of authority.

contempt of court is an inherent judicial power." ORS 33.015 to ORS 33.155 establish procedures to govern the exercise of that power. ORS 33.015 provides some relevant definitions. "Contempt of court" includes the willful "[d]isobedience of, resistance to or obstruction of the court's authority, process, orders or judgments[.]" ORS 33.015(2)(b). It also includes willful "[m]isconduct in the presence of the court that interferes with a court proceeding or with the administration of justice, or that impairs the respect due to the court." ORS 33.015(2)(a). O'Connor's behavior during the telephonic hearing satisfies both of those definitions of contempt. A "remedial sanction" is defined as "a sanction imposed to terminate a continuing contempt of court or to compensate for injury, damage or costs resulting from a past or continuing contempt of court." ORS 33.015(4). A "punitive sanction" is defined as "a sanction imposed to punish a past contempt of court." ORS 33.015(3). The type of sanction imposed by the court in this case—hanging up the telephone and terminating O'Connor's participation in the hearing—was essentially of a "remedial" nature because it was "imposed to terminate a continuing contempt of court[.]" ORS 33.015(4).

■ Under ORS 33.096, a court may "summarily impose a sanction upon a person who commits a contempt of court in the immediate view and presence of the court. The sanction may be imposed for the purpose of preserving order in the court or protecting the authority and dignity of the court." A court may impose a sanction for contempt committed in its presence without following the notice and hearing procedures otherwise required by ORS 33.055 and ORS 33.065. *See State v. Ferguson*, 173 Or App 118, 20 P3d 242 (2001) (addressing meaning of "presence of the court" in ORS 33.015(2) and ORS 33.096). However, ORS 33.105, which describes the possible sanctions for the various kinds of contempts, provides, in part:

> "(3) In a summary proceeding under ORS 33.096, a court may impose one or more of the following sanctions for each separate contempt of court:
>
> "(a) A punitive fine of not more than $500;
>
> "(b) Confinement as a punitive sanction for not more than 30 days; or

"(c) Probation or community service."

In the present case, the court implicitly found O'Connor in contempt in a summary proceeding for contempt committed in the court's presence.[7] However, the sanction that it imposed—terminating O'Connor's participation in the hearing and conducting the remainder of the hearing in his absence—is not one of the sanctions permitted by ORS 33.105 for summary contempt. In short, although the conduct at issue here met the statutory definition of contempt, the sanction did not comport with the statutorily authorized sanction for such contempt.

The question remains, however, whether the court had inherent authority, above and beyond its statutory contempt authority, to impose the sanction that it did.[8] In *State ex rel Oregon State Bar v. Lenske*, 243 Or 477, 407 P2d 250 (1965), *cert den* 384 US 943 (1966), an original contempt proceeding in the Oregon Supreme Court, the court found an earlier version of the contempt statute, ORS 33.020, to be unconstitutional as applied, because it limited the sanction for contempt of court under the circumstances of that case to "a fine not exceeding $100." *Id.* at 490. The court began by noting that the "power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings[.]" *Lenske*, 243 Or at 492, *quoting Ex Parte Robinson*, 86 US (19 Wall) 505, 510, 22 L Ed 205 (1873). The court then stated the operative principle that, under the separation of powers provision of Article III, section 1, of the Oregon Constitution, "the legislature cannot unreasonably abridge or destroy the judicial power to punish for contempt because the legislature cannot take away a power which it does not give." *Id.* at 492-93. Applying that principle, the court concluded:

---

[7] Because the court did not comply with the procedural provisions of either ORS 33.055 or ORS 33.065, the only type of contempt under the statutory scheme that it could have been finding was summary contempt under ORS 33.096.

[8] We emphasize that our discussion of inherent authority that follows pertains solely to the court's authority to *punish* noncompliance with its directives. That is, we do not purport to address the limits of the court's authority to direct the conduct of attorneys and litigants but, instead, limit our consideration to the court's authority to punish noncompliance with such directives—*i.e.*, the types of sanctions that may be imposed and the process that must attend the imposition of such sanctions.

"[T]he power of a constitutionally established court to punish for contempt may be regulated within reasonable bounds by the legislature but not to the extent that the court's power is substantially impaired or destroyed. The provision of ORS 33.020(1) limiting this court's power to punish for an indirect contempt to a fine of $100 except where the right or remedy of a party was prejudiced is an unreasonable limitation upon this court's inherent powers. It is therefore unconstitutional as applied to the facts here as it violates Article III, Section 1, of the Oregon Constitution in that it substantially destroys this court's power to enforce its lawful orders and decrees and is an attempted exercise of a judicial function by the legislative branch of government." *Lenske*, 243 Or at 495-96.

The court expressly left open the question of whether "the legislature has the authority to limit the court's power to punish for contempt where the court is a creature of the legislature and not constitutionally established." *Id.* at 493.

■ In *State v. Moen*, 86 Or App 87, 738 P2d 228 (1987), we answered that question by concluding that "[i]n the absence of a statutory restriction, statutorily created courts have the same powers as a constitutional court to punish for contempt but, because they are created by the legislature, the legislature may limit the courts' powers." *Id.* at 91. That conclusion is not beyond dispute. *See, e.g., State v. Baker*, 126 Or App 508, 513, 868 P2d 1368 (1994) (the power to punish a direct contempt summarily is inherent in all courts and arises from the necessity of preserving order in judicial proceedings); *City of Klamath Falls v. Bailey*, 43 Or App 331, 334, 602 P2d 1107 (1979) (same).[9] As noted, the *Lenske* court found the source of the "inherent authority" doctrine to be the separation of powers provision of the Oregon Constitution. Article VII (Amended), section 1, provides, in part, that "[t]he judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be

---

[9] *See also* Roy Pulvers, *Separation of Powers Under the Oregon Constitution: A User's Guide*, 75 Or L Rev 443, 457 (1996) (noting that decisions addressing the contempt power "illustrate the overall principle that the Judicial Department has inherent constitutional authority to control behavior in its courts" and that "[a]lthough the legislature may legislate" in that area, "the legislation may not expropriate a Judicial Department function nor unduly burden the Judicial Department's ability to function" in that area).

created by law." Thus, under the constitution, all courts, including those created by the legislature, are part of the judicial branch of government. Bluntly: The separation of powers doctrine applies to *all* of the judicial branch, *i.e.*, to all courts exercising the "judicial power," including "statutory" courts, not merely to the Supreme Court.

Here, however, we need not revisit *Moen*'s discussion of "statutorily created courts," because, in any event, even under *Lenske*, legislative limitations on the exercise of the contempt power are constitutionally permissible so long as they do not "substantially impair[ ] or destroy[ ]" that power. *Lenske*, 243 Or at 495. We conclude that the legislature's limitation of summary contempt sanctions to probation, community service, confinement up to 30 days, and a $500 fine does not impermissibly constrain the court's *summary* abilities to preserve order in judicial proceedings. We emphasize that, beyond those sanctions that are available when the court is acting summarily, the court also has the ability to impose greater sanctions in situations where it has afforded the party involved the procedural protections of ORS 33.055 or ORS 33.065. Contempt sanctions in those situations may range from the type available for summary contempt under ORS 33.105(3), to a fine of one percent of the defendant's annual gross income, to confinement up to six months, to a "sanction other than the sanctions specified * * * if the court determines that the sanction would be an effective remedy for the contempt." ORS 33.105(1)(f). That legislative framework, permitting the flexible imposition of a wide range and combination of sanctions, does not "substantially impair or destroy" the courts' abilities to preserve and maintain order in judicial proceedings.

In this case, the sanction summarily imposed by the court exceeded those permissible legislative limitations. The court not only summarily terminated O'Connor's participation in the hearing, but then—after receiving evidence and entertaining argument during O'Connor's enforced absence—proceeded to render judgment. In sum, the court, as a sanction, precluded a party's participation, received evidence and argument *ex parte*, and entered the functional equivalent of a default.

In similar contexts, the courts have held that a sanction of such extremity requires significant justification. *See, e.g., Johnson v. Eugene Emergency Physicians, P.C.*, 159 Or App 167, 173, 974 P2d 803, *rev den* 329 Or 126 (1999) ("keeping in mind that dismissal defeats a litigant's right to redress grievances in a court," sanction of dismissal for discovery violation was not sufficiently justified where court did not explain why less onerous sanction would not be just); *see also Pamplin v. Victoria*, 319 Or 429, 431, 877 P2d 1196 (1994) (court imposing sanction of dismissal for discovery violation "must explain why that sanction is 'just' " and must make "a finding of willfulness, bad faith or fault"); *Mayer v. Salway*, 163 Or App 544, 548, 988 P2d 430 (1999) (in determining whether dismissal for failure to prosecute a case is warranted, court must consider whether less drastic sanction than dismissal would suffice). The court here certainly was justified in finding O'Connor's behavior during the telephonic hearing to be disruptive. The court was entitled to take steps to ensure the integrity of the judicial proceeding by invoking its contempt powers pursuant to ORS chapter 33. However, the court exceeded its authority in summarily imposing the drastic sanction of altogether eliminating O'Connor's "right to redress grievances in a court." *Johnson*, 159 Or App at 173.

That error requires us to vacate the trial court's judgment, as well as its findings and consequent legal conclusions in their entirety, in that those findings and conclusions were based on the evidence that was improperly adduced and considered in O'Connor's absence during the original hearing. Accordingly, the case must be remanded for an entirely new evidentiary hearing.

Nevertheless, and for purposes of guidance with respect to issues that are likely to recur on remand, we do address three purely legal matters: (1) Did the June 28, 1994, agreement violate Oregon DR 2-106(A)? (2) In what circumstances, if any, does California rule 2-200(A) require client's written consent to fee-division agreements between attorneys? (3) Under applicable choice of law principles, would a violation of California rule 2-200(A) preclude enforcement of the June 28, 1994, agreement in this proceeding?

■ Oregon DR 2-106(A) provides:

"A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."

Assuming, without deciding, that that rule is pertinent to a private dispute in determining the reasonableness of an attorney's fee,[10] the rule applies to the reasonableness of fees charged to a client and not to the reasonableness of fees divided between lawyers. Our conclusion in that regard is based on the balance of DR 2-106 and on contextual reference to DR 2-107. DR 2-106(B) and (C) provide:

"(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

"(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

"(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

"(3) The fee customarily charged in the locality for similar legal services.

"(4) The amount involved and the results obtained.

"(5) The time limitations imposed by the client or by the circumstances.

"(6) The nature and length of the professional relationship with the client.

"(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

"(8) Whether the fee is fixed or contingent.

"(C) A lawyer shall not enter into an arrangement for, charge or collect:

---

[10] See *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 141-44, 843 P2d 442 (1992) (Supreme Court has exclusive jurisdiction to adjudicate attorney disciplinary matters; trial courts and Court of Appeals cannot reduce fees as a *sanction* for violation of disciplinary rules).

"(1) Any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of spousal or child support or a property settlement; or

"(2) A contingent fee for representing a defendant in a criminal case."

Thus, nothing in DR 2-106 purports to address fee-division agreements. Rather, many, if not all, of the textual factors are phrased in terms of client perspective and client considerations. *See, e.g.*, DR 2-106(B)(2), (4), (5), (6).

Conversely, DR 2-107 explicitly addresses fee-division agreements exclusively:

"(A) A lawyer shall not divide a fee for legal services with another lawyer who is not a member of the lawyer's law firm or law office, unless:

"(1) The client consents to employment of the other lawyer after full disclosure that a division of fees will be made; and

"(2) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

"(B) DR 2-107(A) does not prohibit payments to a former firm member pursuant to a separation or retirement agreement, or payments to a selling lawyer for the sale of a law practice pursuant to DR 2-111."

Nothing in DR 2-107 expressly cross-references DR 2-106. Implicitly, the only reference to the factors in DR 2-106(B) is with respect to the *total* fee charged. *See* DR 2-107(A)(2). In sum, nothing in DR 2-107 purports to condition the enforceability of a fee-division agreement on the "intramural" *division* being objectively reasonable by reference to the factors set out in DR 2-106(B), or otherwise. Consequently, DR 2-106 is inapposite in this context.[11]

---

[11] *See also Vogelhut v. Kandel*, 308 Md 183, 517 A2d 1092, 1095 (1986) (Maryland's DR 2-106, which is materially indistinguishable from Oregon's DR 2-106, is "plainly limited to fee agreements between a client and his attorney. Where, as here, the agreement is between two attorneys and the agreement has no effect on the fee the client contracted to pay, DR 2-106 is inapposite.").

■　　　We proceed to the scope of California rule 2-200(A). That rule provides:

> "A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:
>
> "(1)　The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and
>
> "(2)　The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200."

O'Connor argues that that rule is necessarily inapplicable to this case because, in his view, it simply requires an attorney to provide the client with written notice of the fee-division agreement and obtain the client's consent to the *employment* of the attorney, but not to the fee-division agreement itself. O'Connor contends that, because it is undisputed that Frost and Conner had written notice of the fee-division agreement and had consented to Brian's employment, it is immaterial whether they actually gave written consent to the fee-division agreement. O'Connor further contends that, in all events, violation of the rule bars enforcement only of what he styles to be "pure referral fee."[12]

O'Connor is wrong in both respects. First, rule 2-200(A), by its terms, requires the client's written consent to the division of fees. That is, the only grammatically plausible referent for "thereto" in subsection (1) of the rule is to the rule's introductory clause ("A member shall not divide a fee for legal services * * *"). *See Chambers v. Kay*, 88 Cal App 4th 903, 911, 106 Cal Rptr 2d 702, 710, *rev granted* (2001) ("The clear and unambiguous language of rule 2-200 imposes a categorical restriction on a division of fees without the client's written consent * * *."); *Margolin v. Shermaria*, 85 Cal App

---

[12] In California legal parlance, a "pure referral fee" is "one 'which compensates one lawyer with a percentage of a contingent fee for doing nothing more than obtaining the signature of a client upon a retainer agreement while the lawyer to whom the case is referred performs the work * * *'." *Chambers v. Kay*, 88 Cal App 4th 903, 911 n 4, 106 Cal Rptr 2d 702, 709 n 4 (2001), *quoting Moran v. Harris*, 131 Cal App 3d 913, 921, 182 Cal Rptr 519, 523 (1982).

4th 891, 903, 102 Cal Rptr 2d 502, 511 (2000) ("Requiring the client's written consent to fee sharing impresses on the client the importance of his or her consent, and of the right to reject the fee sharing.").

■ Second, the rule unambiguously applies to *all* fee-division agreements and not, as O'Connor posits, only "pure referral" fees. In *Chambers*, the court rejected an identical argument:

> "By its terms, rule 2-200 is not strictly limited to 'pure referral' agreements as appellant suggests. The language of the prohibition is much more encompassing; it specifies that an attorney '*shall not divide a fee for legal services* with a lawyer who is not a partner of, associate of, or share-holder.' Nothing in rule 2-200 indicates that division of fees for a 'pure referral' agreement is proscribed unless it complies with the specified conditions, while a division without consent of the client is permitted if all of the attorneys perform at least some duties or legal services. The proscription is a blunt and broad one that extends to any division of fees for legal services. The clear and unambiguous language of rule 2-200 imposes a categorical restriction on a division of fees without the client's written consent, so we must follow it and decline to read a limitation into the statute.

> "* * * * *

> "Moreover, we are convinced that the objectives of the Rules of Professional Conduct to protect the public and promote respect and confidence in the legal profession are furthered by including in the purview of rule 2-200 all agreements to divide fees, not just referrals. Attorney fee agreements 'are strictly construed against the attorney. In order to protect clients and to assure fee agreements are fair and understood by clients, the Legislature enacted numerous statutes specifically delineating the required contents of most attorney fee agreements.' The consumer protection rationale of rule 2-200 is particularly vital where, as here, a contingent fee is split by agreement of attorneys, with the outside attorney paid a percentage of the fee, rather than compensation based upon an hourly rate or other set salary. Disclosure to the client of the allocation of fees and the outside attorney's interest in the case is imperative to facilitate informed consent. Even if all participating attorneys perform legal services and share

responsibilities in a case, the client must still be protected by compliance with the disclosure and consent requirements of rule 2-200. Any other interpretation of the rule would be essentially unworkable. If we were to determine that only pure referrals are covered by rule 2-200, attorneys would be easily able to circumvent the intended protections of the rule merely by structuring the agreement to provide that everyone performs some service, even if only of meaningless or trivial value to the case. We accordingly conclude that the agreement between appellant and respondent for division of fees falls within the scope of rule 2-200, despite the shared responsibilities and costs of the two attorneys."[13] 88 Cal App 4th at 911-13, 106 Cal Rptr 2d at 709-11 (emphasis in original; footnotes and citations omitted).

We thus conclude that, if the evidence on remand establishes that the clients—Frost and Conner—did not consent in writing to a division of fees between O'Connor and Brian, as described in the June 28, 1994, agreement, any such division would violate rule 2-200(A).

■ We proceed, finally, to address the effect of such a violation if proved on remand. Specifically: Under controlling choice of law principles, would a violation of rule 2-200(A) bar enforcement of the June 28, 1994, fee-division agreement in this proceeding?

Under California law, the violation of rule 2-200(A) precludes an attorney's enforcement of a fee-division agreement. *See, e.g., Chambers*, 88 Cal App 4th at 915-18, 106 Cal Rptr 2d at 713-17; *Margolin*, 85 Cal App 4th at 902, 102 Cal Rptr 2d at 510; *Scolinos v. Kolts*, 37 Cal App 4th 635, 639-40, 44 Cal Rptr 2d 31, 33 (1995). In *Chambers*, the court held that the important public policies underlying the rule barred enforcement of the agreement:

---

[13] In *Sims v. Charness*, 86 Cal App 4th 884, 886-89, 103 Cal Rptr 2d 619, 622-25 (2001), another district of the California Court of Appeals concluded that rule 2-200 did not govern fee-division agreements between attorneys who could be characterized as "associates" of each other. In so holding, the court, *in dictum*, suggested that the rule might apply only to "pure referral fees." We find the *Chambers* court's discussion of the issue to be more persuasive than the *Sims dicta*. In particular, we agree with the *Chambers* court that the rule's exception for "associates" is inapplicable to circumstances like those presented here. *See Chambers*, 88 Cal App 4th at 914-15, 106 Cal Rptr 2d at 711-12.

"Appellant claims that a violation of rule 2-200 does not render the contract unenforceable under the facts presented here. His argument is that rule 2-200 is intended to protect the client, not to 'enable an attorney to confiscate fees legitimately earned by another attorney or confiscate costs advanced by that attorney.' He submits that the 'violation of a disciplinary rule may not be interposed as a shield to avoid a contractual duty' by respondent, particularly where the client apparently concurred with the fee-splitting arrangement. Hence, his argument concludes, no public policy purpose exists to prevent enforcement of the agreement for division of fees in the present case between two attorneys, despite the illegality.

"\* \* \* \* \*

"We disagree with appellant's attempts to characterize the fee-splitting agreement as merely one between the two attorneys which did no harm to the client. The Rules of Professional Conduct 'are not only ethical standards to guide the conduct of members of the bar; but they also serve as an expression of public policy to protect the public.' We do not have before us an innocent party, unencumbered by the ethical rules that govern attorneys, who seeks to enforce the fee-splitting contract. Appellant is at least equally culpable as respondent by entering into a contract that contravenes public policy by failing to include terms and conditions necessary to protect the client. Although the client has not personally sought to avoid the agreement in this litigation, we must nevertheless further the public policy objectives of rule 2-200 by denying enforcement of a fee-sharing arrangement that fails to fulfill the requirements of disclosure and informed written consent. The rule that the courts will withhold relief under the terms of an illegal contract or agreement which is violative of public policy is ' "intended to prevent the guilty party from reaping the benefit of his wrongful conduct, or to protect the public from the future consequences of an illegal contract." ' The public policy violation is found in the fee-splitting contract itself, and a participating attorney may not obtain enforcement of it. Recovery by an attorney under an illegal agreement that violates the canons of professional ethics cannot be countenanced. \* \* \*" 88 Cal App 4th at 916-18, 106 Cal Rptr 2d at 713-15 (citations omitted).

The court concluded, nevertheless, that the plaintiff attorney could recover in *quantum meruit* for his services. *Chambers,*

88 Cal App 4th at 922, 106 Cal Rptr 2d at 718 ("We think that under the facts presented, the objectives of rule 2-200 are effectively served by denying appellant the benefit of the illegal contingent fee-splitting contract, without further precluding him from reimbursement for the costs he contributed * * * and compensation in *quantum meruit* for the reasonable value of his legal services rendered on behalf of the cause.").

In *Margolin*, the court reached the same conclusion:

> "[W]e do not find that the potential for professional discipline of the plaintiffs by the State Bar is a reasonable alternative to denying them the benefit of the fee sharing agreement with [the defendant attorney]. If we were to enforce that agreement on the basis that plaintiffs' failure to comply with rule 2-200 is sufficiently addressed by the prospect of such disciplinary proceedings, we would be ignoring the reason for having rule 2-200 in the first place — protection of the consumers. It is not inconceivable that attorneys would choose to subject themselves to potential discipline for failure to comply with rule 2-200, rather than going to the trouble of complying with the rule, if they knew that their noncompliance would not result in denial of the benefits of their fee sharing arrangements. This would thwart the focus and the object of rule 2-200, which is consumer protection, not attorney protection. The consumer protection comes from the attorneys' written disclosure and the clients' written consent, just as the consumer protection for clients of licensed real estate brokers comes from the necessity of having a written contract for brokers' fees." 85 Cal App 4th at 902, 102 Cal Rptr 2d at 510.

*See also Scolinos*, 37 Cal App 4th at 640, 44 Cal Rptr 2d at 33 ("It would be absurd if an attorney were allowed to enforce an unethical fee agreement through court action, even though the attorney is potentially subject to professional discipline for entering into the agreement.").

In contrast to the California case law addressing rule 2-200, no reported Oregon decision directly addresses whether, under Oregon law, a fee-division agreement between attorneys that violates a disciplinary rule is unenforceable as between the contracting attorneys. Nevertheless, the Oregon Supreme Court's opinion in *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 843 P2d 442 (1992), is

instructive. There, the court considered whether an award of attorney fees could properly be reduced or denied based on an attorney's alleged violation of DR 5-105.[14] In reversing our conclusion that the attorney's conduct had, in fact, violated the rule and that no attorney fees could be awarded in the face of such a violation,[15] the court first concluded that only the Supreme Court—and, by extension, disciplinary bodies appointed by that court—had jurisdiction "to investigate, review, or sanction disciplinary rule violations, as such." *Kidney Association*, 315 Or at 141. Thus, "[b]ecause the test announced by the Court of Appeals was framed as a sanction for disciplinary rule violations, it was error." *Id.* at 148.

Nevertheless, and notwithstanding the Supreme Court's exclusive jurisdiction over disciplinary matters, the court also indicated that disciplinary rules *could,* in appropriate instances, define the scope and extent of a lawyer's fiduciary duty to his or her client: "Certain disciplinary rules describe some aspects of a lawyer's duty of loyalty and may be used to inform an analysis of a lawyer's conduct[.]" *Kidney Association*, 315 Or at 144, 148. In that limited sense,

> "In the determination whether a lawyer breached a fiduciary duty to a client, the court may consider the standard of conduct prescribed by the disciplinary rules. But, it is the breach of fiduciary duty owed to a client, rather than a violation of a disciplinary rule, that may result in a reduction or loss of a fee." *Id.* at 144 (citations omitted).

The court in *Kidney Association* ultimately concluded that the attorney's conduct had neither violated DR 5-105 nor breached any associated fiduciary duty. *See* 315 Or at 145-48.

■■ *Kidney Association* is not *directly* applicable to the question here. Still, three premises underlying its holding are instructive. First, outside the context of disciplinary proceedings—and particularly in breach of contract and malpractice actions—disciplinary rules may define the scope of duties, including fiduciary duties, that an attorney owes to a

---

[14] DR 5-105 addresses conflicts of interest.

[15] *See Kidney Association of Oregon v. Ferguson*, 97 Or App 120, 775 P2d 1383 (1989), *adhered to as modified on recons* 100 Or App 523, 786 P2d 754 (1990).

client. Second, in those contexts, proof of violation of a disciplinary rule may be material to the court's determination of an attorney/litigant's entitlement to fees or the reasonableness of fees. Third, by focusing on whether the violation actually breached a fiduciary duty flowing from attorney to client, *Kidney Association* at least implicitly suggests that conduct violating a bar disciplinary rule cannot preclude or limit an attorney's recovery of fees unless the attorney's conduct actually adversely affected the interests of the *complaining party*. *See generally Harmon v. Mt. Hood Meadows, Ltd.*, 146 Or App 215, 221, 932 P2d 92 (1997) (contractual term is voidable based on generalized public policy only if the party challenging enforcement "show[s] that, *as applied*, the contractual term is unenforceable").

Applying those principles here, under Oregon law a violation of rule 2-200(A) would not preclude enforcement of the fee-division agreement. That is so both because the party opposing enforcement (Brian) did not suffer any actual injury from the alleged violation[16] and because neither the circuit court nor this court has the jurisdiction to impose nonenforcement or fee reduction as a disciplinary sanction. *See Kidney Association*, 315 Or at 141-44. Thus, there is a "true conflict" between Oregon and California law as to the effect of a violation of rule 2-200 on the enforceability of the fee-division agreement. *Accord Angelini v. Delaney*, 156 Or App 293, 300, 966 P2d 223 (1998), *rev den* 328 Or 594 (1999) (the threshold question in every choice of law analysis is "whether there is a material difference between Oregon substantive law and the law of the other forum. If there is no material difference—if there is a 'false conflict'—Oregon law applies").

■ In resolving true conflicts of law, we employ the approach adopted in *Lilienthal v. Kaufman*, 239 Or 1, 395 P2d 543 (1964). Under that analysis, we consider "which state has the most significant relationship to the parties and the transaction, and * * * determin[e] whether the interests

---

[16] *Cf. Chambers,* 88 Cal App 4th at 920, 106 Cal Rptr 2d at 716-17; *Margolin,* 85 Cal App 4th at 902, 102 Cal Rptr 2d at 510 (both describing rule 2-200's *client*-protective purposes).

of Oregon are so important that we should not employ California law, despite its significant connection with the transaction." *Stricklin v. Soued*, 147 Or App 399, 404, 936 P2d 398, *rev den* 326 Or 58 (1997).

Here, it is unclear which state had the most significant relationship with the parties and the transaction. At the time they entered into the agreement, in June 1994, Brian was an Oregon resident and a member of the Oregon bar, and O'Connor was a California resident and a member of the California bar. Of the clients, at least Zachary and Frost were, by that time, California residents.[17] The agreement itself, which arose after a series of interstate communications between Brian and O'Connor, contemplated a division of fees based on Brian's rendition of services (presumably, primarily in Oregon) and O'Connor's rendition of services (presumably, primarily in California). Ultimately, O'Connor rendered services both in California and in Oregon, and—although there is no indication that the attorneys originally anticipated the prospect—Brian was rehired and rendered significant additional representation in Oregon.

In sum, the "relative relationship" inquiry is inconclusive. What remains, ultimately, are the relative interests of Oregon and California. Oregon's interest in upholding the contract is rooted, fundamentally, in the principle that contracts should generally be enforced: "It is elementary that public policy requires that such contracts shall be enforced by the courts of justice unless some other overpowering rule of public policy intervenes which renders such agreement illegal or unenforceable." *Bliss v. Southern Pacific Co. et al*, 212 Or 634, 646, 321 P2d 324 (1958). That interest in upholding the contract is not insignificant. Rather, as the court in *Lilienthal* noted, the "rule of validation"—the doctrine that "if a contract is valid under the law of any jurisdiction having significant connection with the contract * * * the law of that jurisdiction validating the contract will be applied"—weighs favorably toward application of Oregon law. 239 Or at 9.

Oregon's interest, however, must be balanced against that of California. *Restatement (Second) of Conflicts*

---

[17] It is unclear whether Conner was an Oregon resident in June 1994.

§ 188, cmt c (1971); *see Manz v. Continental American Life Ins. Co.*, 117 Or App 78, 82, 843 P2d 480 (1992), *adhered to as mod on recons* 119 Or App 31, 849 P2d 549, *rev den* 317 Or 162 (1993) (Oregon courts look to section 188 for guidance in resolving choice-of-law issues in contractual disputes). In particular, comment c to section 188 notes:

> "[A] state where a contract provides that a given business practice is to be pursued has an obvious interest in the application of its rule designed to regulate or to deter that business practice. * * *
>
> "Whether an invalidating rule should be applied will depend, among other things, upon whether the interests of the state in having its rule strike down the contract outweighs in the particular case the value of protecting the justified expectations of the parties and upon whether some other state has a greater interest in the application of its own rule."

Here, California has a compelling interest in regulating the practices of California attorneys, particularly with respect to their representation of California resident clients. *See, e.g., Chambers, Margolin, Scolinos.* As the court mandated in *Chambers*, "Recovery by an attorney under an illegal agreement that violates the canons of professional ethics cannot be countenanced." 88 Cal App 4th at 918, 106 Cal Rptr 2d at 715. *See also Margolin*, 85 Cal App 4th at 902, 102 Cal Rptr 2d at 510 (permitting attorney to recover on fee agreement in violation of rule 2-200 "would thwart the focus and the object" of the rule).

On balance, we conclude that California's interest in precluding enforcement of this contract by a California attorney substantially outweighs Oregon's interest in enforcing the agreement. That is, California's interest in regulating, and sanctioning, the conduct of California attorneys who circumvent rules designed to protect California clients outweighs Oregon's interest in upholding contracts generally. Thus, if the evidence on remand establishes a violation of California rule 2-200, that violation will preclude enforcement of the June 28, 1994, fee-division agreement, and O'Connor will, consequently, be limited to recovering the reasonable value of his services.

Judgment vacated; findings and conclusions vacated in their entirety; remanded for further proceedings.